# CHARLESTON

## STATE *v.* ABBOTT.

Submitted September 3, 1908.    Decided October 6, 1908.

HOMICIDE—*Criminal Law—Malice—Degree of Murder—Burden of Proof—Presumption from Unlawful Act—Reasonable Doubt.*

    A case in which no new principle is involved to be passed upon by this Court. (p. 417.)

Error to Circuit Court, McDowell County.

John Abbott was convicted of murder in the first degree, and he brings error.

*Affirmed.*

ANDERSON, STROTHER & HUGHES, for plaintiff in error.

WM. G. CONLEY, Attorney General, R. R. SMITH, and G. L. COUNTS, for the State.

MCWHORTER, JUDGE:

This was a prosecution in the criminal court of McDowell county against John Abbott for the murder of Henry Pegram. Upon the trial the jury found him guilty of murder in the first degree and that he be punished by confinement in the penitentiary. Defendant applied to the circuit court of McDowell county for a writ of error which was refused and the defendant then procured a writ of error from this Court, making several assignments of error: in overruling the demurrer to the indictment; in admitting improper evidence to go to the jury over the objections of the defendant; in refusing to admit proper evidence on behalf of the defendant; in giving improper instructions to the jury at the request of the State; in refusing to set aside the verdict of the jury and award the defendant a new trial and in refusing to arrest judgment on said verdict.

As to the demurrer to the indictment the counsel for plaintiff in error make no point in their brief and the indictment seems to be entirely sufficient under the statute. The demurrer was properly overruled.

There is but one bill of exceptions saved to the defendant in the record which covers all the evidence and the exceptions to the instructions given for the State. While objections to certain parts of the evidence were made by the defendant, many of such objections were sustained and in a few instances overruled but no exceptions taken as to the overruling and no reference made in the brief for defendant complaining of the rulings of the court touching such evidence.

Counsel for defendant seem to rely wholly upon their assignment of error in giving the instructions on behalf of the state, and the fact that the finding of the jury was contrary to the instructions given by the court on behalf of the defendant. The instructions given for the State are as follows:

No. 1. "The Court instructs the jury that whoever kills a human being with malice aforethought. is guilty of

murder. That a murder which is perpetrated by poison, lying in wait or any other kind of wilful, deliberate and premeditated killing, is murder in the first degree."

No. 2. "The Court instructs the jury that where a homicide is proved, the presumption is that it is murder in the second degree. If the State would elevate it to murder in the first degree, she must establish the characteristics of that crime, and if the prisoner would reduce it to manslaughter, the burden is on him."

No. 3. "The Court instructs the jury that on a charge of murder, malice is presumed from the fact of killing. When the killing is proved, and is unaccompanied with circumstances of paliation, the burden of disproving malice is thrown upon the accused."

No. 4. "The Court further instructs the jury, that whenever the killing is willful, deliberated and premeditated, the law infers malice from this fact."

No. 5. "The Court instructs the jury that to convict one of murder, it is not necessary that the malice should exist in the heart of the accused against the deceased. If the accused was guilty of shooting Henry Pegram with a pistol, and of killing him, the intent, malice and willfulness, deliberation and premeditation may be inferred from the act, and such malice may not be directed against any particular person, but such as shows a heart regardless of social duty and fatally bent on mischief."

No. 6. "The Court instructs the jury that there is no particular period during which it is necessary that malice should have existed, or the prisoner should have contemplated the homicide. If the intent to kill is executed the instant it springs into the mind, the offence is as truly murder as if it had dwelt there for a long period."

No. 7. "The Court instructs the jury that a man is presumed to intend that which he does, or which is the immediate or necessary consequence of his act."

No. 8. "The Court instructs the jury that proof beyond a reasonable doubt is not beyond all possible or imaginary doubt, but proof to a moral certainty, rather than to an absolute certainty."

No. 9. "The Court instructs the jury that a reasonable doubt is not a vague, or uncertain doubt, and what the jury believe from the evidence as men, they should believe as jurors."

It is contended on behalf of the defendant that while the state's instruction No. 1 might state a correct rule of law in the abstract, it was not supported by the evidence in the case; that the evidence did not show, nor tend to show, that Abbott killed Pegram with malice aforethought but on the contrary that it showed that the killing was not done wilfully, deliberately and premeditatedly, hence the instruction could not apply to the case.

The circumstances of the shooting as related by witness James Boyd, the only person immediately present at the killing, when asked to tell the jury just what he saw were as follows: " Well, I went out on the back porch where the urinating bowl was on the porch. I was out there making water and John Abbott came out. He says 'Stand around a little bit, Jim, please, and let me get there to the bowl. I am about to urinate in my britches.' I gets back out of the way for John to get in. Then the other fellow walks up on this side of him. Q. What other fellow? A. Henry Pegram. He walks up on the right of him and then I went on back from him and was fixing up my clothes and I heard John say, 'Don't you piss on that floor' talking to Pegram, and Pegram he says 'It is none of your business,' and John says, 'You will have to pay for it.' And so then I heard John say, 'What are you doing with that pistol?' and before I could look around a shot was fired and when I looked Pegram was falling and John he passed right on out by me and went on in the saloon, and the fellow was lying down there and I went on in the saloon right behind John. John went on in and pulled off his apron and put on his coat and hat, and I went on in and he called me in the office, and he said, 'Jim, is that fellow dead?' and I said 'Yes, he is dead' and he commenced crying like and I believe he had a handkerchief in his hand, and he said to me 'I didn't aim to kill him, I just aimed to hit him,' and he said 'I wish I had gone away when I intended to.' and got to talking about his wife and child."

The defendant himself testified that he went out to the

back porch and when he first got out there he saw Pegram who was not doing anything at the time, but afterwards commenced to urinate on the floor which witness told him not to do; that Pegram replied that he would urinate where he pleased and asked what Abbott had to do with it, and then he told Pegram that if he continued to do so he would make him pay for it, and when he told him that Pegram run his hand down in his pocket and said: "'I will stop you from making me or anybody else pay for it,' and he started to run his hand down in his pocket;" and witness said: "I had a little pistol in my pocket and I hit him aside the head with it and the pistol fired when I struck him," he said he did not cock the pistol. "I did not hit him just with my hand. I hit him with the gun, hand and all." And on cross-examination: "Q. Did you just thump him with the gun this way? A. No sir, I just came with the whole side of it in my hand. Q. If you hit him sideways with that gun as you say you did, explain to the jury then, how the bullet went into his head and went through to the opposite side? A. Well, I don't know. I only know how I hit him."

The ball went straight into the head and to the skull on the other side. The jury seems to have been unable to see the reasonableness of defendant's theory that in striking the deceased with the hand and the pistol on the side of the head the pistol should fire accidentally and discharge the ball directly into his head. Counsel for defendant contend that as the defendant testified that the pistol fired without his cocking it, or pulling the trigger, it was the duty of the jury to believe his testimony that it was an accident because it was not directly contradicted by other witnesses. That the pistol was fired from his hand there is no dispute, and his explanation is based upon a very improbable theory and it was wholly within the province of the jury to believe it or not. The witnesses were before them and they were to take into consideration as well the manner and demeanor of the witnesses as the words they uttered. The circumstances connected with the shooting were as much in evidence to be considered by the jury as the verbal testimony of the witnesses. It is said defendant was corroborated by the testimony of witness Boyd. This witness at the time of the

shooting had his back to the parties and did not see it at all; says he heard Abbott say: " 'What are you doing with that pistol?' and before I could look around a shot was fired, and when I looked around Pegram was falling and John passed right on out by me and went on in the saloon and the fellow was lying down there and I went on in the saloon right behind John." It would seem that if it had been an accident, as was claimed on the trial, the perpetrator of the act would not have deliberately walked away from the scene but would have at once tendered his kind offices to render the victim of the accident all aid possible. When one man intends to shoot another his first thought seems to be to find a plausible pretext to excuse himself. He can construe the slightest motion of his intended victim into an effort to draw a weapon for the purpose of assaulting him, and he may cry out charging his intended victim with attempting to draw a weapon, that the bystanders may take the impression that his act is done in self defense and thus lay a foundation for his defense when brought to answer for his crime. The first instruction for the state is substantially the language of the statute in defining murder in the first degree, and was given in *McCue's Case*, 103 Va. 870, and approved by the court of appeals of that state.

Instruction No. 2 was given in *Cain's Case*, 20 W. Va. 679, and approved in *Douglass' Case*, 28 *Id.* 297, and also in *McCue's Case*, *supra*.

Instruction No. 3 was given in the language here used in *Hall's Case*, 89 Va. 178, where it is said in the opinion, speaking of several instructions including this one: "These instructions are so obviously correct and in literal conformity with the numerous decisions of the old general court and of this court, that no other comment upon the prisoner's exception to the action of the trial court in giving them is necessary." Citing *Hill's Case*, 2 Grat. 594, and *Honesty's Case*, 81 Va. 283.

The 4th instruction was also given in the *McCue Case*, above cited, and approved by the court of appeals of Virginia.

Instruction No. 5 is the same as one given in the case of *State* v. *Welch*. 36 W. Va. 690, and which is there approved

by this Court on pages 697-8. Also *State* v. *Tucker*, 52 *Id.* 420.

Instruction No. 6 was given in the *Welch Case*, before cited, and was there held to be good. See also *Hall's Case* and *Douglass' Case*, *supra*.

Instructions Nos. 7 and 9 were both held good in *State* v. *Dickey*, 48 W. Va. 325; and No. 9 was also approved in *Bickle's Case*, 53 *Id.* 597. Instruction No. 8 was approved in *Ice's Case*, 34 *Id.* 244-251.

So that it appears that all the instructions given at the instance of the State have been approved by the supreme court of Virginia or West Virginia and quite all by the latter. They all propound the law correctly and were properly given.

The defendant asked for and the court gave six several instructions touching all the defenses set up by him and giving his theory of the case in every phase thereof including accidental shooting, self-defense, the matter of reasonable doubt, &c. It is clear that from the evidence in the case the jury were fully warranted in the verdict they rendered and not finding any error in the judgment the same is affirmed.

*Affirmed.*