# CHARLESTON.

### STATE v. CHARLES AMOS LONG.

### Submitted April 5, 1921.   Decided May 10, 1921.

1. CRIMINAL LAW—*Instructions to Acquit if Reasonable Doubt
   Raised by Evidence Itself or Ingenuity of Counsel Erron-
   eous.*

   An instruction in a trial for felony, which tells the jury that
   if a reasonable doubt of the guilt of the accused is raised in
   their minds by the evidence itself, or by the ingenuity of
   counsel, they should find the accused not guilty, is erroneous,
   and should be refused.  (p. 675.)

2. ARREST—*Police Officer May Arrest Without Warrant one Com-
   mitting Breach of Peace in His Presence.*

   A police officer, within his jurisdiction, may lawfully arrest,
   without warrant, one who commits a breach of the peace in
   his presence or view.  (p. 676).

3. HOMICIDE—*Instruction as to Right of Person Arrested Without
   Warrant to Kill Policeman Erroneous.*

   Where a police officer, in attempting to arrest without war-
   rant a person who is intoxicated, disorderly, loudly swear-
   ing and disturbing the peace, is shot and killed by that person
   who, to excuse his act, relies on the defense of accidental dis-
   charge of the revolver in his hand caused by muscular reflex
   action superinduced by a blow on his cheek bone from the
   policemen's mace, and not upon self defense or the unlawful-
   ness of the attempted arrest, an instruction, which tells the
   jury that if they believe the attempted arrest was unlawful
   then the defendant was justified in repelling it with force and
   to kill the policeman if such was necessary to protect himself
   from death or great bodily harm, is not properly drawn and
   should be refused.  (p. 677).

                        88 W. Va.

4. CRIMINAL LAW—*Instructions Propounding Abstract Proposi-
tions of Law Improper, But Not Reversible Error, Unless
Misleading.*

Instructions propounding abstract propositions of law
should not be given; but if given, and there be evidence to
which they are applicable, the appellate court will not reverse
for that cause, unless it is clear that the jury has been misled
or confused thereby.   (p. 679).

5. SAME—*Instructions for Prosecution Need Not Embody Theory
of Defense if Given in Defendant's Instructions; Instruc-
tions Must be Considered as a Whole.*

If the law applicable to and governing the theory of the
defense is fully and fairly propounded in the instructions
given for the defense, it is not necessary that those given for
the prosecution should contain propositions of law relied upon
by the defense, or that there should be incorporated therein the
theory of the defense. Instructions must be considered together
as a whole; an instruction based on one theory, unless bind-
ing, does not ignore another theory on which other instruc-
tions are given.   (p. 680).

6. SAME—*If Context Shows That Word Mistakenly Used Was
Not Misleading it is Not Prejudicial.*

Instructions must be considered in the light of the evidence;
and if the context of an instruction and the evidence clearly
show that one word therein was used for another, and that the
jury could not have been misled by a mistake so clear and
palpable, the error will not be considered as prejudicial.
(p. 681).

7. BREACH OF THE PEACE—*"Breach of Peace" Defined.*

A "breach of the peace" includes all violations of the public
peace, order or decorum, such as to make an affray; threaten
to beat, wound or kill another, or commit violence against
the person or property; contend with angry words to the dis-
turbance of the peace; appear in a state of gross intoxication in
a public place; recklessly flourish a loaded pistol in a public
place while intoxicated; and the like.   (p. 682).

8. CASE APPROVED.

Fourth point of the syllabus in *State v. Weisengoff,* 85 W. Va.
271, is approved and applied.   (p. 684).

9. CRIMINAL LAW.—*Instruction as to extent to which Jury are
Judges of Evidence Held Erroneous.*

An instruction which tells the jury that they are the sole
judges of the evidence, and of the weight to be given thereto,

and that they may believe or refuse to believe the testimony of any witness or any part of his evidence, is erroneous, prejudicial and reversible error. (p. 685).

10.    SAME—*Order and Time of Introduction of Evidence in Discretion of Trial Court.*

The order and time in which evidence shall be introduced is largely in the discretion of the trial court and a verdict will rarely be reversed for that reason, unless clearly prejudicial. (p. 686).

11.    ARREST—*Known Peace Officer Arresting Without Warrant Need Not Disclose Authority Until Request Therefor.*

In making an arrest without a warrant a known peace officer is not bound to disclose his character or authority, or give notice of his intention, until the party has submitted, or has demanded by what authority the arrest is made, as his known official character is sufficient in the first instance to require submission, unless a demand for disclosure of his authority is first made. (p. 688).

12.    CRIMINAL LAW—*Hypothetical Question as to Muscular Reflex Action Causing Discharge of Pistol Need Not Give Remote Details.*

Where a violent blow on the cheek bone is struck with a policemen's mace, and it is designed to prove by expert testimony that the blow would cause muscular reflex action sufficient to immediately cause the discharge of an automatic pistol then in the hand of the recipient of the blow, it is not necessary to incorporate in the hypothetical question, propounded to the expert witness, all the details of the evidence in the case, remote from the time when the blow was given; they could shed no light upon whether the blow given, as fully described and set out in the question propounded, would cause muscular reflex action. (p. 690).

13.    HOMICIDE—*De Facto Officer Entitled to Same Protection as if Title Undisputed in Prosecution for Murder of De Facto Officer Appointment and Qualification Need Not be Shown.*

A de facto officer while engaged in the execution of his duties is entitled to the same protection from assault, obstruction or interference, as if his title was undisputed. And in a prosecution for the murder of an officer de facto it is not necessary to prove that he was duly appointed or elected, or had duly qualified. (p. 686).

14.    SAME—*Evidence of Friendly Relations Between Defendant and Victim Admissible to Rebut Element of Malice.*

Evidence tending to show friendly relations existing be-

tween one charged with homicide and his victim is admissible
to rebut the element of malice, and it is error to refuse to
allow it to go to the jury.  (p. 695).

15.  WITNESSES—*Impeaching Evidence Inadmissible in Absence of
Proper Foundation.*

Evidence of a witness, called solely for the purpose of im-
peaching another witness by contradicting his testimony on
some particular point, by showing he had on other occasions
made conflicting statements, should be refused where no
proper basis has been laid for the contradiction.  (p. 691).

Error to Circuit Court, Wetzel County.

Charles Amos Long was convicted of murder in the second
degree, and he brings error.

*Reversed and remanded.*

*T. M. McIntire, T. A. Brown, Wm. T. George* and *J. Black-
burn Ware,* for plaintiff in error.

*E. T. England,* Attorney General, *Charles Ritchie,* Assistant
Attorney General, and *G. W. Coffield,* Prosecuting Attorney,
for the State.

LIVELY, JUDGE:

Charles Amos Long was convicted of murder in the second
degree in the Circuit Court of Wetzel County and sentenced
to confinement in the penitentiary for a term of 12 years,
and prosecutes this writ.

The defendant was a merchant and real estate dealer re-
siding in the town of Pine Grove in Wetzel County and the
evidence tended to show that in the late afternoon and eve-
ning of April 16, 1919, he became intoxicated and was reck-
lessly operating his automobile over the streets of that town
and was told that he must be arrested by Clem Long, a po-
liceman of the town, for that offense.  But while walking
along the street, apparently in charge of the policeman, he
drew his revolver and presented it at the policeman with the
statement that he would not be arrested, accompanying the
act with words indicative of an intention of inflicting upon
the policeman serious bodily harm.  The arrest was thus
successfully resisted and the policeman afterwards went to

the mayor's office and reported that the defendant had
"bluffed" him, but did not ask for nor secure a warrant
with which to apprehend him. The mayor advised the po-
liceman not to attempt to arrest the defendant while intoxi-
cated but to wait until he was sober. A short time after-
wards, and about an hour or three quarters before the fatal
shooting, the defendant again began speeding his car and
acting generally in such a boisterous and reckless way as to
attract the attention of a considerable crowd of the citizens
who gathered together evidently to observe his acts. He went
into a store on the main street of the town, where a shoe
drummer was exhibiting to the merchant a line of sample
shoes and threw one or more of the shoes and some other
articles of merchandise out of the store onto the sidewalk,
one of the shoes striking a pedestrian. He then came out of
the store and offered an apology to the person hit by the
shoe, which apology not being accepted very readily, he
became incensed and wanted to have a fight with the sup-
posed offender. At another store he became dissatisfied with
some cigars which he had purchased from the merchant and
tore them up and threw them on the floor until he obtained
one which was satisfactory, and then threw the money to pay
for the same on the floor. At another time he approached
the same policeman near defendant's store and began quar-
reling with him and again threatened to shoot him with the
same revolver and called him a vile name in the presence of
defendant's wife and various other persons. Shortly before
the fatal shooting he got out of his car in front of his office,
which was a short distance from his store, and attempted to
unlock the office and enter, but being unable to find the proper
key or possibly to fit it in the lock, he again drew his pistol
and asked a boy, of about 14 years of age, to take the pistol
and shoot the lock off. By this time quite a crowd of citi-
zens had gathered on the street near by, evidently with the
purpose of observing what would happen, and the defend-
ant, perceiving Clem Long, the policeman, standing near the
office and in the crowd, immediately approached him and
began an altercation with him, swearing and abusing the po-
liceman and making assertions that he could not and would

not be arrested, and contending with the policeman with loud words and in a threatening manner. At this time defendant had placed his pistol in his right hand coat pocket and was grasping it with his right hand. As a result of the altercation the policeman struck defendant a violent blow on the cheek bone with his mace, and about the time of the blow the pistol was discharged, the bullet entering the abdomen of the policeman above the hip bone and passing through the body and out on the opposite side about four inches lower than the point of entrance, causing the death of the policeman some hours afterwards. The evidence is conflicting as to whether the shot was fired before the blow was struck, some of the witnesses so testifying, or whether the blow was struck first and the pistol fired afterwards. A large crowd had gathered and witnessed the difficulty, variously estimated at from 35 to 75 persons. All of the numerous witnesses agreed that there was not much difference in time between the firing of the shot and the blow. They were almost simultaneous. Defendant was either knocked down by the blow from the mace or some other person hit him from behind thus causing his fall. He was then disarmed with considerable difficulty and force by some of the bystanders and immediately taken to jail.

This statement of the evidence is taken largely from the testimony of the witnesses for the State, and may be inaccurate in unimportant details, but it is sufficient to give the main facts out of which the difficulty arose.

Numerous alleged errors occurring in the trial are insisted upon by the defendant as cause for reversal of the judgment.

It is unnecessary to consider the first six assignments of error, in view of the disposition we have concluded to make of the case. They relate (1) to refusal to continue the trial on the showing made, (a) because of absence and illness of counsel, (b) prejudice and ill-feeling against the defendant in the county, and (c) absence of alleged material witnesses; (2) refusal to furnish defendant with a list of the jurors promptly upon request made by him; (3) entering of an order in the absence of the defendant, refusing the request of

the prosecuting attorney for a list of the jurors; (4) refusal to quash the entire panel of jurors because of the failure of the court to appoint jury commissioners under chap. 124, Acts. 1919; (5) failure of the record to show that the sheriff was instructed to keep the jury together without communication with anyone; and (6) failure of the record to show that the jury returned into court on October 9, a day of the trial, in custody of the sheriff. A cursory examination of these assignments leaves us under the impression that they are without merit; but it would serve no useful purpose to consider them critically as none of them will likely arise upon a new trial.

Instruction No. 6 offered by the defendant was refused. It relates to reasonable doubt of the guilt of the accused. It tells the jury if a reasonable doubt is raised by the evidence itself, or by the ingenuity of counsel, upon any hypothesis reasonably consistent with the evidence, that doubt is decisive of the defendant's innocence. It is argued that the ingenuity of counsel means argument of counsel. The right of a prisoner to be heard at the bar through counsel is firmly established everywhere. It is conserved in our bill of rights, where it is expressly provided that the accused "shall have the assistance of counsel." Wide latitude is given to counsel in making their arguments to the jury, and it is their privilege to make such deductions as the evidence will justify. It has been held to be error to instruct the jury entirely to disregard argument of counsel. *Garrison* v. *Wilcoxen,* 11 Ga. 154; *People* v. *Ambach,* 247 Ill. 451. But instructions cautioning the jury not to regard statements of counsel in argument as evidence, and to disregard counsel's expressed belief that his client was innocent have been held proper, as not destroying the effect of the argument. *Smith* v. *State,* 95 Ga. 472; *State* v. *Heath,* 237 Mo. 255. But the instruction here is not confined to argument of counsel and can only be considered as relating to the argument by implication. The instruction relates to the ingenuity of counsel. Counsel in conducting trials often ingeniously propound questions and present improper evidence, and, although ruled out, it leaves its impression, which is sometimes diffi-

cult for a jury to discard. Counsel in argument will often ingeniously and disingenuously make statements of fact not warranted by the testimony. It would be traveling afar from the beaten paths to instruct jurors that they may base a reasonable doubt upon ingenuity of counsel in the conduct of the trial. There were other instructions for the defendant, notably Nos. 4, 5, 7 and 8, which fully covered the doctrine of reasonable doubt.

Defendant's instruction No. 14, refused, told the jury that if they believed the deceased was a police officer, and acting as such, without a warrant commanding the arrest of the defendant, made an attack upon the defendant while on the streets of Pine Grove, and struck him a severe blow on the cheek bone with his mace and thereby caused the pistol in the defendant's hand to be discharged from reflex muscular action, causing the death of the deceased, then they should find for the defendant, was properly refused. It is predicated on the assumption that a police officer cannot make an arrest without a warrant, which is not the law. A police officer may make arrests without warrant for offenses committed in his presence and which amount to a breach of the peace. The defense relies on the decision in *State* v. *Lutz,* 85 W. Va. 330, 101 S. E. 434, but that decision does not hold that an arrest by a policeman cannot be made without warrant. It expressly says that such an arrest may not be made, unless an offense, which is being committed in the presence of the officer, amounts to a breach of the peace. Besides the instruction leaves out the important element as to whether or not the policeman was acting unlawfully or without just cause. An arrest without a warrant is not *per se* unlawful. The instruction was an incomplete statement of the law, and would tend to mislead the jury.

Defendant's instructions No. 15, 25 and 25-a refused are not insisted upon as error here and will not be considered.

Defendant's instruction No. 30, refused, told the jury that the policeman's mace, introduced in evidence, was a dangerous and deadly weapon. The mace was inspected and handled by the jury, they could ascertain its weight, length and diameter, and its deadly and dangerous character was

a question of fact which they had the right to determine. We do not find in the record such a description of the mace as would justify a court in pronouncing it a dangerous and deadly weapon as a conclusion of law. The instruction was properly refused.

Defendant's instruction No. 33, refused, in effect told the jury that the policeman had no authority to make the arrest of the defendant for an offense less than a felony not committed in his presence, without a warrant, and if they believed from the evidence that the policeman was at the time of the shooting attempting to arrest the defendant for an offense committed earlier in the evening, and for which he had no warrant, and for which he had had ample time to obtain a warrant, then the attempt to arrest was unlawful, and the defendant was justified in the use of such force as was reasonably necessary to preserve his liberty and to repel force with force, and to kill the policeman if such killing was reasonably necessary to protect himself from death or great bodily harm at the hands of the policeman, and under such facts the killing would be justified and they should find the defendant not guilty. There are several reasons which would justify the refusal of this instruction, the most cogent of which is that the instruction tells the jury that if they believed the arrest unlawful because for an offense not committed in the presence of the officer, then the defendant could repel force with force and kill the policeman if such killing was necessary, etc. In resisting an unlawful arrest one cannot go to the extent of killing the officer in order to preserve his liberty only. The only justification for killing in such instance would be where self defense is relied upon, or where self defense enters, and then the defendant must believe and have reasonable grounds to believe that it is necessary for him to do so to save his own life or to protect himself from great bodily harm. *State* v. *Lutz,* 85 W. Va. 330. The instruction is misleading. Moreover, the theory of the State was, and there is much evidence to support it, that defendant was intoxicated and disorderly, operating his automobile over the streets of the town at a dangerous speed, and generally creating a disturbance of the

peace of the town, and having successfully resisted arrest
by the deceased a short time before the fatal shooting, by
threatening to shoot him with a pistol then in his hand, and
perceiving the officer in the street near the office of defend-
ant, approached him for the purpose of provoking a quar-
rel, and again "bluffing" him. The fatal shooting resulted.
On the other hand the defendant does not claim nor rely
upon self defense. His version of the shooting is that he
was going from his office or from his car to his store room
for the purpose of removing money left in the cash register
by his wife, and perceived and approached the deceased, and
said to him, "You ain't going to arrest me, are you?" The
policeman replied, "No, I am not going to arrest you to-
night, Amos. I told you that." "I said, 'I didn't think
you was going to arrest me, and I know you hadn't ought
to', or words to that effect. He said, 'No sir, I am not going
to do it tonight, but I am tomorrow', or 'I will', something
to that effect. That is as near as I can remember the con-
versation, every word of it." He then testified that he did
not know that deceased was going to arrest him or that de-
ceased was going to strike him with the mace, but suddenly
the policeman struck him with the mace so quickly that he
scarcely knew what it meant, and involuntarily threw up his
right hand, which was in his coat pocket grasping a revolver,
to ward off the blow from his head, and without taking his
hand out of his coat pocket. He did not know whether the
blow knocked him down or whether he was hit from be-
hind. He was asked the question: "Tell the jury what you
remember, if anything, about how you came to fire the shot
that struck the deceased, Clem Long?" Answer. "I don't
know. Somebody told me, after I had been taken to jail
some time, that I had shot a man—that is the first I knew,
the first that I really knew that the gun had went off."
What application or relevancy does an instruction on self-
defense for the defendant have under this evidence? Or
what application has the law of repelling an unlawful ar-
rest? The instruction is inconsistent with the defense. How-
ever, there was some appreciable evidence coupled with the
blow of the mace, and the uncertainty of whether the shot

preceded the blow, which would give color to the claim of self defense, and the jury would have the right to say whether self defense prompted the firing of the shot, and that the defendant had reason to believe, and did believe, he was in imminent danger of his life or great bodily harm. But as above suggested, the instruction is not so framed, and is faulty.

Instructions 34 and 36, offered by defendant, were properly refused for the same reason.

Defendant's instruction No. 35, refused, but modified and given as No. 35-a, sets out the defense relied upon, that is, that the firing of the fatal shot was caused by reflex action of the muscles of the defendant induced by the blow from the policeman's mace, and without any intent on the part of the defendant to fire the shot; and it told the jury that if such was their belief from all the evidence, then they must find the defendant not guilty. The modification made by the court is so slight and inconsequential that it is difficult to understand why it was made. The only change is the substitution of the word "then" for the word "yet", and the difference in the meaning of the two words in that connection and with the context of the instruction is so little that there is no substantial ground for objection to the change.

We now come to consideration of the instructions given for the State over the objection of the defendant. Instructions 1 to 15, inclusive, (excepting Nos. 7, 9, 10 and 11, which were refused) all correctly propound propositions of law applicable to the case, but are objected to because they are in the abstract. It is well settled that abstract propositions of law should not be given when there is no evidence on which they can be predicated; but where they are given, and there is evidence in the case to which they are applicable, but no particular reference is made to the evidence in such instructions, it will be presumed that the jury made the proper application. Blashfield's Inst. to Juries, sec. 432, p. 973. "That an instruction presents merely an abstract proposition is certainly a very sufficient reason why a court may refuse to give it; but if given and it states the law correctly, I am not aware that it has ever been held a sufficient cause

for reversing a judgment." *Koiner* v. *Ranking,* 11 Gratt. 420. Unless the appellate court can see that the jury might have been mislead, or confused, by an instruction in the abstract, it will not reverse. *Sheppard* v. *Ins. Co.,* 21 W. Va. 370.

Instruction No. 1, which defines murder, and which says that murder perpetrated by poison, lying in wait, or any other willful, deliberate or premeditated killing is murder in the first degree, seems to have been approved in *State* v. *Abbott,* 64 W. Va. 411, which was a case of murder arising out of a sudden brawl. There was no evidence of poisoning or lying in wait in the case under consideration, but it may have been proper for the purpose of showing the deliberation and premeditation necessary as an element of murder in the first degree. It could not have misled the jury in this case. The verdict is not for first degree murder. Was not this instruction rather for the benefit of the prisoner? How has he been prejudiced?

Instruction No. 2 was given and approved in the celebrated case of *State* v. *Cain,* 20 W. Va. 679.

Instructions 3, 5, 12, 15 and 17 are claimed to be erroneous, because the theory of the discharge of the pistol by involuntary reflex muscular action of defendant was not incorporated therein; because they ignore that defense. The law applicable to the facts as deduced from the evidence and interpreted by the prosecution, is usually embodied in the State's instruction, and it is not necessary, and it would be impracticable, to incorporate in each instruction the theories, limitations and conditions which go to make up the instructions as a whole. *State* v. *Dodds,* 54 W. Va. 289. The court gave 27 instructions at the instance of the defense, fully covering its theories and its conclusions of fact from the evidence, and we find that its claim of accidental and unintentional shooting caused by reflex muscular action was included therein, and the jury directed to find the defendant not guilty if they believed the fatal shot was fired as claimed by the defendant. The instructions must be considered as a whole. *State* v. *Cottrell,* 52 W. Va. 363. *Gray's Case,* 92 Va. 772. An instruction based on one theory, unless bind-

ing, is not to ignore another theory on which another instruction is given, even though the theories be totally inconsistent. Even where an instruction is incomplete but states the law correctly so far as it goes, and another or other instructions remedy the incompleteness, the error is cured. *State* v. *Prater,* 52 W. Va. 132.

State's instruction No. 17 is also claimed as erroneous because it uses the word "blow" instead of "shot." That instruction reads: "The Court instructs the jury that voluntary manslaughter is where the act causing death is committed in the heat of sudden passion caused by provocation; and they are further instructed that if they believe beyond a reasonable doubt, from the evidence in this case, that the defendant, Charles Amos Long, in the heat of sudden passion, caused by provocation, killed Clement Jefferson Long at the time and place alleged in the indictment, they should find the defendant, Charles Amos Long, guilty of voluntary manslaughter, unless they further believe from the evidence that the defendant believed, and had reason to believe, that the shot which resulted in Clement Jefferson Long's death was necessary to protect his own life, or protect himself from great bodily harm, and that the necessity of inflicting said *blow* was not brought about by the defendant, Charles Amos Long's own conduct." There was no evidence whatever of the deceased being killed by a blow. It is conclusive that he was killed by the pistol shot wound inflicted by defendant, and the context of the instruction is so clear and convincing that "shot" was meant instead of "blow" and the evidence is so clear on that point that the jury could not have been misled. Instructions must be interpreted in the light of the evidence, and not in the abstract. *State* v. *Dodds,* 54 W. Va. 289. The instruction is further criticised because it tells the jury that the defendant cannot justify himself on the plea of self defense, if the necessity of inflicting said blow (shot) was brought about by his own conduct. Counsel insists that the word "conduct" is misleading; that it should have been "misconduct" or "bad conduct" or "wrongful act." While this instruction is loosely drawn and justly subject to criticism, we do not think the jury could have

been misled either by the use of the phrase "said blow," or the word "conduct", in the light of the other instructions, and the evidence, and the evident meaning of the instruction itself. *Kimball* v. *Borden,* 97 Va. 477.

The State's instruction No. 19 is confidently claimed as erroneous. It reads: "The court instructs the jury that if they believe from the evidence in the case beyond a reasonable doubt, that, at the time of the shooting of Clement Jefferson Long by the prisoner, Charles Amos Long, the said Clement Jefferson Long was then and there a policeman of the town of Pine Grove, Wetzel County, West Virginia, and shortly before or at the time of said shooting the accused, Charles Amos Long was in the presence of said Clement Jefferson Long in the street of said town drunk, and guilty of contending with angry words and swearing to the disturbance of the peace of said town, that such acts and conduct was an offense under the laws of this state, which, if committed in the presence of such policeman, was just legal cause for the arrest of the accused by said policeman without a warrant, and in such a case the accused had no right to resist." The objection to this instruction is that it does not correctly state the law. It is contended that a policeman does not have authority to arrest, without warrant, a person drunk or guilty of contending with angry words and swearing to the disturbance of the peace of the town in the presence of the officer; that such authority could only be given a policeman by town ordinance, duly passed by the proper municipal authorities and recorded in the manner prescribed by law; and that no such ordinance of the town of Pine Grove was properly introduced in evidence. Without considering at this time whether the ordinance of the town giving the right of its police officers to make arrests without warrant in certain cases, and which went to the jury, was properly admitted, we hold that a police officer, irrespective of town ordinance, has the authority under the common law to make arrests, without warrant, for misdemeanors committed in his presence, which are a breach of the peace. *State* v. *Lutz,* 86 W. Va. 330, 101 S. E. 434. What is a breach of the peace? "The term 'breach of the

peace' is generic, and includes all violations of the public peace or order, or decorum; in other words, it signifies the offense of disturbing the public peace or tranquility enjoyed by the citizens of a community; a disturbance of the public tranquillity by an act or conduct inciting to violence or tending to provoke or excite others to break the peace; a disturbance of the public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community. By 'peace' as used in this connection is meant the tranquillity enjoyed by the citizens of a municipality or a community where good order reigns among its members. Breach of the peace is a common-law affense.'' 9 C. J. p. 386. There was abundant evidence to show that for sometime prior to, and up to the time of the shooting, the defendant had been intoxicated, and that he had been driving his car recklessly through the streets, had drawn his pistol on the police officer and threatened to shoot him, and had entered a store and thrown out sample shoes on display, and immediately before the shooting cursed the policeman and called him vile names in a loud and angry voice. It is true that all this was denied by the defendant, but the evidence was quite sufficient on which to base the instruction. If the jury believed that such acts were thus committed by the defendant, then they were justified in finding that the defendant was committing a breach of the peace and the attempted arrest was lawful. We find no reversible error in this instruction.

Instruction No. 22 for the State was to the effect that if they believed the defendant beyond a reasonable doubt, being armed, approached the policeman in such a manner as to give him reasonable cause to apprehend a design on the part of defendant to do him great bodily harm or take his life, and that he, the policeman, had reasonable cause to believe and did believe that such design was about to be accomplished, and that the danger was imminent, he, the policeman, had a right to strike the defendant with his mace. The objection to this instruction is that there was no evidence on which to base it. An inspection of the evidence for the

State shows that when the defendant saw the policeman standing near the sidewalk he immediately approached him and began an altercation. His right hand was in his coat pocket, in which he had just placed his pistol, which he had exhibited a few moments before when he asked the boy to shoot the lock off of his office door. That afternoon he had threatened to shoot the policeman rather than be arrested for recklessly speeding his automobile on the streets and had then drawn his pistol; he admits having the pistol in his grasp in his coat pocket when he approached the officer. Un-doubtedly the policeman was apprehensive of danger. The evidence was sufficient for the giving of this instruction; in fact it was strong enough to sustain a verdict of murder in the first degree.

The State's instruction No. 24 reads: "The court instructs the jury that if they believe from the evidence beyond a reasonable doubt that the prisoner Charles Amos Long armed with a revolver sought the deceased, Clement Jefferson Long, with a view of provoking a difficulty with him, or with intent of having an affray with him, for the purpose of killing him, and a difficulty ensued, he can not without some proof of a voluntary change of conduct or action on his part excuse the killing of the deceased, Clement Jefferson Long, upon the ground that the deceased, Clement Jefferson Long, struck him first with his mace, and that the revolver in the hands of the said Charles Amos Long was accidentally discharged; for the law will not hold him guiltless, who by seeking a combat and continuing therein brings upon himself the very thing out of which the accident grew; accidental killing wholly to be excused from all guilt must be caused in the doing by some lawful act." The objection is that even if the jury believed that the defendant sought out the policeman with the intent of provoking an affray, or with the intent to kill, if, while engaged in the affray, he accidentally fired the fatal shot as the result of reflex muscular action superinduced by the blow of the mace, then he would be innocent. Such is not the law. Malice is an essential element of first or second degree murder, but if the jury believed that defendant brought about the affray by an

unlawful act and as a result thereof the accidental shooting occurred, resulting in the homicide, it would be manslaughter only. The instruction tells the jury that under such circumstances the defendant would not be guiltless, and would not be wholly excused. This question arose in the case of *State v. Weisengoff,* 85 W. Va. 271, where it was one of the main contentions, and is fully discussed there with citation to many authorities. Weisengoff was unlawfully resisting an arrest for a misdemeanor and while doing so and attempting to escape from the sheriff who had boarded Weisengoff's automobile, recklessly or unintentionally drove the car against an iron bridge which he was attempting to cross, injuring the sheriff so badly that he died in about two hours thereafter. This instruction is fully justified under the principles announced in that case.

Instruction 25 for the State is as follows: "The court instructs the jury that they are the sole judges of the evidence and of the weight to be given thereto, and that they may believe or refuse to believe of any witness or any part of his evidence, and that when passing upon the credibility of any witness they may take into consideration his interest in the matter in controversy, the reasonableness or unreasonableness of his statements, his bias or prejudice in the matter, if any appear, and his demeanor upon the witness stand." This instruction was given in *State v. Dickey,* 48 W. Va. 326 and also in *State v. Bickel,* 53 W. Va. 597. However, the recent case of *State v. McCausland,* 82 W. Va. 525, disapproved it, holding that the instruction would permit the jury to reject the testimony of a witness arbitrarily. A somewhat similar instruction was given in *Siever v. Coffman,* 80 W. Va. 425 and disapproved, Judge MILLER saying therein: "The jury being the sole judges of the credibility and weight to be given to the testimony of witnesses, the court cannot by an instruction directly or impliedly tell them they should disregard any evidence." In the more recent case of *State v. Ringer,* 84 W. Va. 546, 100 S. E. 413, this same instruction was held to be erroneous and was one of the reasons for reversing the conviction in that case. But the Attorney General insists that the addition of the words, "and of the

weight to be given thereto'' (after the words ''sole judges of the evidence'') and the addition of the words ''or any part of his evidence'' (after the words in the instruction ''refuse to believe any witness'') would cure the instruction. We cannot see that these words add to or take from the meaning of the instruction. The viciousness of the instruction remains, in that it tells the jury they are at liberty to arbitrarily believe or disbelieve any witness or any part of his testimony. We hold that the giving of this instruction is reversible error. Whether or not it was aimed at the testimony of the defendant, which was contradicted in many instances by other witnesses, we need not say.

Various bills of exception were taken by the defendant to the introduction and refusal of evidence. Many are without merit and relate to matters immaterial and will not be reviewed.

Perry Edgar was introduced as a witness for the defense and permitted to state that he had heard Harry Roome, a witness for the State, tell the policeman, Clem Long, while standing in front of Stone's store a short time before the shooting: ''If I was in your place I would go over and knock his head off with that mace, or words to that effect.'' The State objected to the question but the court permitted the witness to answer, stating that it could go in for the purpose of showing the feeling of witness Roome toward the defendant, but not for impeachment. This is the ground of the exception. Upon examination of the evidence of Roome we do not find that a proper foundation for impeachment was laid, but the witness was permitted to answer, and the defendant got the full benefit of the evidence even if the foundation for impeachment was not properly laid.

Dr. Fulton, a witness for the State, who did not see the shooting, was asked on examination if a shot fired from the coat pocket of the defendant, who was practically the same height as the deceased, would have taken the downward course in the body of the deceased, as described by the doctor, unless the deceased was leaning forward at the time, or unless he was on a lower level, and the court refused to permit an answer. All of the witnesses for the State who saw

the shooting, and the defendant himself, testified that the defendant threw his hand up and the shot was fired through the pocket of the coat while above its ordinary position. The doctor's answer to the question as propounded would have shed no light on the relative position of the defendant and his victim. He was also asked on cross-examination to describe the condition of the defendant's wound received from the policeman's mace. The court held that this was not proper cross-examination, but that the defense could recall the doctor and make him their witness for that purpose when the defense put in its testimony. The order and time in which evidence shall be introduced is largely in the discretion of the trial court and a verdict will rarely be disturbed for that reason. *Goodwin* v. *Tony Pocahontas Coal Co.*, 106 S. E. 76. The witness could have been summoned by the defense and this evidence offered at the proper time. However, the evidence was for the purpose of showing the force and seriousness of the blow, which was fully described by other witnesses and admitted by the State. Its probative force would have been largely cumulative. Many of the errors assigned relate to the evidence and instructions on the question of the right of the policeman to arrest the defendant; whether or not he should have had a warrant; whether the attempted arrest was lawful or unlawful. H. C. Young, the town recorder, was introduced and the municipal minutes and records were introduced and admitted over defendant's objection, showing ordinances making it an offense to operate automobiles over the streets at a rate exceeding 12 miles per hour, making it an offense for anyone to engage in riotous tumults, profanity, obscene language etc.; and an order, tending to show the employment of Clem Long, the deceased, as night policeman at $1.00 per day. In our view we do not consider the introduction or rejection of these ordinances and minutes as very material. ''If one kills an officer de facto, while resisting or obstructing him in the discharge of his official duties, he is guilty of murder. Hence upon an indictment of this nature it is not necessary for the prosecution to prove that the officer killed was duly appointed or elected, or had duly qualified. It is sufficient to prove that he

was an officer de facto." Constantineau De Facto Doctrine, sec. 215. Clem Long was a de facto officer. He was recognized as a policeman by the municipal authorities and the citizens generally, had been sworn in as such, wore the badge of a policeman and carried a mace. He was known and recognized as such by the defendant. Nor do we think that because he had no warrant it would materially affect his status as an officer, or his right and duty to make the arrest. It was not because he did not have a warrant that the homicide occurred. He was not asked by the defendant to exhibit a warrant. It would have been of no assistance or protection to him. His authority was not questioned. The defendant, according to the State's witnesses, stated that no one could arrest him, accompanying the assertion by profanity and by calling the policeman a vile name. From the defendant's testimony of the shooting above set out in detail it will be seen that he had no idea that an arrest would be made, or that the deceased was attempting to make an arrest. He was not resisting arrest. He did not attempt to justify the homicide on the theory of an unlawful arrest, and for that reason that he had a right to resist. His defense is accidental shooting pure and simple. The law of resistance to an unlawful arrest has no application here under the theory of the defense. What relevancy then can there be in the lack of a warrant? Moreover, if the defendant at the time of the attempted arrest or immediately before, and in the view and presence of the officer, was committing a breach or a disturbance of the peace, (and there was ample evidence to that effect) no warrant was necessary in order to justify the attempted arrest. "In making an arrest a sworn peace officer, commonly known as such and acting within the limits of his jurisdiction, is not bound to show his warrant, even though it is demanded of him, as every one is bound to know the character of such an officer when acting within his proper jurisdiction, and is bound to submit peacefully to the arrest before he can demand that the cause thereof be made known to him." 5 C. J. p. 392, sec. 16. "In making an arrest without a warrant it is usually held that a known peace officer is not bound to disclose his character or authority, or give notice of his in-

tention, until the party has submitted, as his known official character is sufficient in the first instance to require submission until formal notice of authority and intention to make an arrest, and the cause for it, can be given." Idem. p. 419.

M. L. Long, the father of the deceased, was introduced by the State to prove a dying declaration made by the deceased, and his examination for laying the foundation was conducted in the presence of the jury. He was permitted to testify that the deceased told him that "Amos shot him and he struck him", and thereupon the defense moved to strike out the question and answer, and the court then on his own motion excluded all the testimony of the witness, and instructed the jury not to consider any of it. Both the State and the defense excepted to the court's action, and the defendant insists here that the court erred in permitting any of the witness' testimony to be introduced and then striking it out, because of the impression it would make on the minds of the jury, and which they could not eradicate by being told to do so. The claim is that the court should have known, before admitting the evidence to the jury, whether or not it was properly admissible. The general rule is that preliminary questions to determine the admissibility of such evidence may be conducted in the presence and hearing of the jury, or otherwise at the discretion of the trial court; but if had in the absence of the jury and the evidence is decided to be admissible, then all of the preliminary evidence must be again given to the jury, because ultimately it is for the jury to determine, in weighing the declaration, whether or not it was made when the deceased was in extremis and conscious of his condition; it is error to remove these questions from their consideration. 21 Cyc. p. 985. No motion was made by the defense to have the preliminary examination made out of the hearing of the jury. The evidence of the declaration was excluded on motion of the defendant, and we fail to see wherein complaint can be made because the motion was sustained. Error will often creep into jury trials, and it is usual and proper for the court, upon perceiving it, to instruct the jury to disregard the error. Often it is accomplished by written instruction. A verbal instruction at the time of the

happening is more effective. The judge should not have permitted the dying declaration to go to the jury until he concluded that the proper foundation had been laid. If it was error, the error has been cured by the instruction to disregard it.

Error is predicated on the refusal of the court to permit the medical expert, Dr. C. A. Wingerter, to answer some of the hypothetical questions propounded to him by the defense on the theory that the shot was fired by the defendant as a result of reflex muscular action, caused by the blow from the policeman's mace. The claim is made that the full probative value of the evidence was destroyed because the court did not permit the questions to contain a full statement of all the facts and circumstances, as interpreted by the defense, which led up to what occurred when the fatal shot was fired, and the blow from the mace given. An inspection of the record discloses that the various questions which the witness was allowed to answer, considered together, detailed all of the essentials necessary for a full presentation of the theory of the defense. The questions took a wider range than necessary. It was not necessary to state in detail in the hypothetical questions all of the evidence leading up to the time when the blow was struck in order for the witness to determine whether reflex action of the muscles caused the firing of the pistol when the blow was struck. These details could shed no light upon whether the blow would produce that physical result. It was in the discretion of the court to require irrelevant facts to be omitted. That irrelevant facts should be excluded from such questions is an obvious, not to say instinctive exercise of administrative power. *Ruschenberg* v. *Ry. Co.*, 161 Mo. 70.

The defendant was asked if he and the deceased did not take a drink of liquor together the day before the shooting in defendant's office, and the court refused to permit the witness to answer. We can see no reason why this question should not have been answered. It was admissible to show a friendly feeling between them. The question of enmity or friendship existing between the parties prior to a homicide is admissible to show the mental attitude of each toward the

other.   The element of malice in this, as in all other cases of like character, is one of the essential matters of inquiry, and evidence tending to show a friendly relation between the slayer and his victim is relevant to rebut any presumption of malice.   *O'Boyle* v. *Com.*, 100 Va. 785.

Another assignment of error is that the court would not permit the defendant to show that his intoxication was the result of the use of liquor taken as a preventative of the influenza—a malady then prevalent in the community—an excuse for his intoxicated condition.   Voluntary intoxication is no excuse for crime, a rule of law so well settled and approved by reason and experience that to permit one to give excuses for drinking to intoxication, and hence to excuse his acts while in that condition, would destroy its efficacy.   Excuses for the use of liquor as a medicine for existing or contemplated sickness would then be the rule, without much exception, in cases of this character.

We have examined defendant's assignment of error contained in bill of exceptions E. 46.   Luther Conner was introduced to contradict the evidence of Pat Taylor, who had stated that he had accompanied the policeman to the scene of the shooting and that he accompanied him there for the purpose of watching defendant, who was intoxicated, to see that he did no harm to anyone, and for no other purpose.   Connor, who was a stranger in the town, had heard some man who was accompanying the policeman that night, both going in the direction of the place where the affray occurred, say, "By God I will help arrest him."   When asked if he recognized Pat Taylor as the man who made the remark, he replied, "I couldn't swear he was, or who was who, that night. I was a perfect stranger in Pine Grove."   He was then asked if Taylor had not told him he was with the policeman that night, and the court refused to permit the witness to answer.   No foundation for a contradiction had been laid.   The evidence was uncertain and remote.   It was not error to refuse it.

There are other assignments of error to the action of the court in refusing to allow witnesses called for the purpose of contradiction to give evidence, because proper foundations

for contradiction had not been laid, which we do not deem important to pass upon. If the points upon which they were called to contradict are material, proper foundations can be laid and the evidence permitted on a new trial.

The judgment of the Circuit Court of Wetzel County will be reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and remanded.*