# CHARLESTON.

STATE *v*. DAVID HICKS

(No. 6221)

Submitted May 15, 1929.    Decided May 28, 1929.

*Howard B. Lee,* Attorney General and *W. Elliott Nefflen,* Assistant Attorney General, for the State.

*Ben Hopkins* and *A. G. Mathews,* for plaintiff in error.

LIVELY, JUDGE:

Convicted of second degree murder and sentenced to five years in the penitentiary for the killing of Coleman Shafer, the defendant, David Hicks, obtained this writ of error.

When the case was called for trial, the defendant moved for a continuance because of the absence of alleged material witnesses. The application was properly denied, for, no statement having been made of the facts to which the witnesses would testify, the materiality of their testimony was not apparent. *State* v. *Whitecotton,* 101 W. Va. 492, 16 C. J., sec. 921, page 501. The remaining assignments of error require a summary of the evidence.

According to witnesses for the state, on May 26, 1927, about two o'clock in the afternoon, the defendant called for Coleman Shafer at the latter's home. The decedent's mother told the defendant that Coleman had gone to the mouth of Stenson with a boy by the name of Willy Matheny, but that he would be back later in the afternoon. Defendant decided to wait. He informed Mrs. Shafer that he wanted Coleman to do pipeline work with him, but the decedent's mother said that she could not get along without her boy, because some of the children were sick in bed with the measles. While he was waiting, the defendant took a 32-caliber revolver from his

pocket and on being furnished some machine oil, sat down and proceeded to clean it. According to Mrs. Shafer, ''he said he wanted to clean the gun up, he said I might get me a man with it. I only got one bullet, but that will be enough to get one man.'' He also talked about going to church that night. Later, while he was still working on his revolver, Willy Matheny and Coleman Shafer arrived at the home. Mrs. Shafer had supper ready and invited the visiting youths to share the meal with her family. The defendant came to the table carrying his gun with him. ''He kept saying to Coleman I have a notion to shoot you right through the pouch.'' The deceased told him to put the gun in his pocket before he hurt somebody. After they had finished supper, Coleman and the defendant remained at the table. The defendant had been acting rather peculiarly, as though he was intoxicated. About this time, he broke his revolver down and failing in his effort to shut it up again, extended it across the table to Coleman who was sitting at the opposite end thereof about four feet away. The latter took the lone bullet out of the gun, shut it up and returned the weapon to the defendant with the request that he put it in his pocket. The defendant snapped the gun once or twice and then asked Coleman what he had done with the bullet, and said: ''Damn you give it back to me.'' The bullet was handed to him and the defendant put it in the gun. Coleman then said: ''David you are going to hurt somebody, put that gun down.'' The defendant refused; and the deceased, upon being warned by his mother that he was likely to be injured, pushed back his chair and was starting to arise from the table, when he was shot by the defendant. According to the witness Matheny, after defendant inserted the bullet in the gun, and after Coleman's request to put the gun in his pocket, ''he (defendant) laid his head on the end of the table where he was sitting and I walked into the other room, and I looked around, David raised up his head and he shot and shot Coleman.'' The defendant went out on the porch where the injured boy had been carried, examined the wound, and then ''left running.'' An attempt to secure a doctor failed, but through the aid of some neighbors who had been called in, the deceased was

removed to a hospital at Spencer early the next morning where he died about fourteen days later. Mrs. Shafer testified that there was no drinking at her house on the day of the shooting. Willy Matheny stated that on the morning of the 26th, he and Coleman Shafer had drunk some moonshine liquor and become intoxicated, but that when they arrived at the decedent's home between four and five o'clock that afternoon, neither he nor Coleman Shafer was under the influence of liquor. The state also introduced in evidence the fact that on the night previous to the homicide, the defendant had called Coleman Shafer aside as the latter was returning from a church meeting and had engaged in a heated conversation with him. The witnesses testified that they heard Coleman and the defendant both using violent language, but they were unable to determine the subject-matter of the conversation. This, in substance, was the evidence introduced by the state.

The evidence produced on behalf of the defendant was quite different. According to the defendant, about two o'clock on the afternoon of May 26th, having secured a revolver from one of his brothers; while on his way home, he stopped at the house of the decedent to return a flashlight borrowed from him the night before. As defendant was talking to the decedent's mother, one of her small boys reported that he had found a barrel of mash in a nearby field. Mrs. Shafer had the mash brought into the house, and after about a gallon of it had been strained, she and the defendant partook rather freely thereof. The defendant claims that he drank about a pint which tended to make him drunk, after which he gave up the idea of returning home, and remained at Mrs. Shafer's until Coleman Shafer and Willy Matheny came about three or four o'clock that afternoon. Upon Coleman's arrival, he offered the defendant a drink from a bottle which he was carrying, and this additional liquor had the effect of making the defendant considerably more intoxicated. He states that after the meal had been finished while he and Coleman were still sitting at the table, several of those present had the revolver in their possession and were snapping it. He remembered that he gave the gun to Coleman who took the shell out

and handed the gun back empty. He explained the shooting thus: ''I was sitting back from the table this way and I was at the end of the table, I laid my arm down this way and laid my head on my arm and the gun was laying like that, and the powder burnt my arm and the hair on my temple here.'' He further stated that he did not intend to shoot Coleman Shafer, and that he did not know there was a load in the revolver at the time he, the defendant, laid his head down in the manner described. The witness said that he did not snap the revolver at anybody, and that he knew everything until he laid his head on his arm; and that this was the last thing he remembered, until after the shot was fired; that it was just a minute or two from the time he received the gun until he assumed the position described. The defendant further stated that after the gun was discharged, he realized that Coleman had been hurt and went out to ascertain the extent of the latter's injuries, from there he went to his brother's house; and thence home. The witness also testified that while Mrs. Shafer was at the hospital with Coleman she had the defendant bring her a dress from her home. The defendant denied that he had any liquor before he arrived at the decedent's home, and that he had ever stated that he wanted Coleman to work with him on the pipe-line or that he was waiting until Coleman returned with the view of going to church with him that evening. He further denied that there had been any previous difficulty between him and Coleman, and stated that they had always been the best of friends. According to his testimony, Coleman Shafer and Willy Matheny were drunk at the time they arrived at the decedent's home. He introduced witnesses who testified that earlier in the afternoon they had seen Matheny and Shafer in a state of intoxication, and one witness stated that about four o'clock while on their way home, they had stopped at her house and that in her opinion they had been drinking. Defendant was corroborated by his brother and father as to the powder burns on his forehead and left arm. There was testimony that the shot which killed the deceased made a powder mark on the tablecloth. The deceased was 19 years of age, Willy Matheny 18, and the

defendant 22. This is substantially all the evidence introduced on the trial of the case.

The defendant complains because of the court's action in permitting the state to introduce the testimony of Ada Wadkins. The defendant had stated on direct examination that he had become intoxicated because of the liquor furnished by Mrs. Shafer and upon cross-examination was asked if he had not asked the witness, Ada Wadkins, to drink liquor from a jar which he had with him as he passed her house about two o'clock on the afternoon of the shooting. He denied that he had done so, and denied that he had seen her that day. Whereupon, the state put the witness Wadkins upon the stand and proved by her that defendant had passed her house as detailed and had offered her a drink of liquor. This was a contradiction of the witness on a collateral point, but under the facts of this case, we do not believe the accused has been greatly prejudiced by this testimony.

It is further contended that it was error to permit the witnesses, Edna Matheny and Ada Matheny, to testify that on the night before the shooting, while Coleman Shafer was accompanying them home from a church meeting, the defendant had called him aside and the two engaged in a heated conversation. Exception is especially taken to the court's ruling in allowing the witness Edna Matheny to state, "Will Coleman overtaken me and said to me we don't want no trouble." An objection was made by the defendant, and the prosecuting attorney asked that the language Coleman used to the witness be stricken out. No further action was taken by the court in ruling upon this objection, but it is clear that the jury must have understood that the statement was not to be considered. As to the other testimony given by these two witnesses we can see no error. It simply went to the fact that on the night previous to the shooting, the defendant and Coleman had engaged in a conversation during which both of them had used a great many oaths. This evidence, while probably not of very great value, was entitled to go to the jury for what it was worth to aid them in determining the true state of relations or feeling existing between the defendant and Coleman Shafer.

The defendant also contends that the court erred in refusing to permit a number of the defense witnesses to testify that shortly after the shooting, the deceased stated to them that he and the defendant were good friends; that there had been no quarrel between them; that there was no ill feeling; and that the shooting was purely accidental. It will be recalled that none of these witnesses were present at the time the deceased was shot, and that they were called in later. One of these witnesses said that the statement was made to him about eight or nine o'clock that night. The deceased was shot about five o'clock in the afternoon. A number of other witnesses testified that the statements were made to them as the wounded man was being conveyed to the hospital late that night or early the next morning. These latter statements, and that made at eight or nine o'clock in the night were clearly not a part of the *res gestae*. It is not apparent from the record just how soon after the deceased was wounded, the other statements were made, although one or two of the witnesses would have testified that the accused had told them about this matter "shortly" after the shooting. As was pointed out in a recent decision of this Court, *State* v. *Johnson*, 107 W. Va. 216, handed down this term, while the element of time is not always controlling in determining whether a statement is a part of the *res gestae*, the particular circumstances and the mental and physical condition of the declarant being of considerable importance, it is often a vital fact in ascertaining whether a declaration is a spontaneous and contemporaneous one. Because of this indefiniteness of time and the absence of facts and circumstances which might bring the alleged statements within the exception to the hearsay rule, the ruling of the trial court was proper.

Error is also assigned because of the court's action in excluding the testimony of a number of defendant's witnesses to the effect that Mrs. Shafer, the mother of the deceased, had stated to them after the shooting that her son and the defendant were good friends; that there had been no ill feeling between them, and that the shooting was an accident. Mrs. Shafer had testified that she had never believed the shooting to have been accidental. An examination of the

record as to this excluded testimony reveals that, except in one instance, namely, that of the testimony of Relda Ater, no foundation was laid for the contradiction of the witness as to these alleged statements. Mrs. Shafer was asked on cross-examination if she had not talked to this witness about the shooting shortly after it occurred. She replied that the witness had not been at her home until in berry picking time. She was then asked "Didn't you tell her at that time you didn't see the shot fired?" She denied having made such a statement. Relda Ater was put on the stand by the defendant and asked this question: "Please state if you had a conversation with Caroline Morris (Mrs. Shafer) about this shooting, and if so, what she told you." The question was objected to and the court sustained the objection. Whereupon, the attorney for the defendant vouched the record that if the witness was permitted to answer she would say that immediately after the shooting she had a conversation with Caroline Morris, in which the latter stated to the witness that she turned her back to the table when the gun went off and did not see the shooting at all, and that Caroline Morris further told the witness that "she did not think David did it on purpose; that it was an accident; and that Coleman told her it was an accident." It can readily be seen that the vouched testimony went far beyond the questions propounded to the witness sought to be impeached. Mrs. Shafer was not asked whether she had stated to the witness that she had turned her back when the gun went off, neither was Mrs. Shafer asked whether she told the impeaching witness "that she did not think David did it on purpose; that it was an accident; and that Coleman had told her it was an accident." The proffered testimony not only went far beyond the range of the questions asked Mrs. Shafer, but it also included testimony that was clearly inadmissible, namely, that the deceased had told Mrs. Shafer the shooting was an accident. The defendant could not, in this way, accomplish indirectly that which he could not do directly. We do not believe the court erred in sustaining the objection to this testimony.

Error is also assigned because the court excluded certain testimony of the witness William McKown. This witness was

asked if he was acquainted with the character of the place kept by Caroline Morris (Mrs. Shafer), and whether it was good or bad. The court sustained an objection to this question. Whereupon, the defendant vouched the record that the witness if permitted to answer would say that he was acquainted with the home kept by Mrs. Shafer, and that the same was a place of very bad character. Granting that evidence of the kind of home maintained by Mrs. Shafer was material and admissible, the particular question and answer were clearly not proper. The proffered testimony did not attempt to designate in what way the character of the place was bad. It was not sufficiently definite to be of value to the jury in weighing the evidence of the state's witnesses.

Error is also assigned in the giving of instructions for the state. State's instruction No. 2 told the jury that a man is presumed to intend that which he does or which is the immediate or necessary consequences of his act. It is contended that the defendant having interposed a plea of accidental shooting, it was improper to give this abstract principle of law which, when read with the other state's instructions, placed the burden of negativing malice upon the defendant. The theory of the state, supported by appreciable evidence, was a homicide committed under such circumstances as to warrant a finding of murder. It was therefore entitled to the benefit of this presumption by the non-binding instruction embodying it. *State* v. *Legg,* 59 W. Va. 315, 325. The defendant's theory and the defense was fully protected by instructions given on his behalf, particularly those pertaining to accidental shooting. A similar instruction was approved in *State* v. *Abbott,* 64 W. Va. 411, where a like defense was interposed.

The defendant having been convicted of murder in the second degree, cannot complain of the alleged errors in the state's instructions Nos. 3, 4, 5, 7 and 10, relating to first degree murder. It is quite generally held, that "where a crime is divided into degrees, if the court commits error in instructing the jury as to the higher degree of such crime and they return a verdict of guilty of a lower degree as to which they were properly instructed, the defendant cannot

complain.'' *State* v. *McMillion,* 104 W. Va. 1; *State* v. *Watson,* 103 W. Va. 482; *State* v. *Bailey,* 103 W. Va. 605; 14 R. C. L., page 817; 14 Ann. Cas. 989; 30 C. J., section 712, page 446.

The first part of state's instruction No. 6, pertaining to first degree murder, will not be considered for the reason just assigned. The second part of this instruction told the jury that on a charge of murder, malice is presumed from the fact of the killing, and that when a killing is proved and is unaccompanied with circumstances of palliation, the burden of disproving malice rests upon the prisoner. A similar instruction was approved in *State* v. *Abbott,* 64 W. Va. 411, where one of the defenses relied upon was accidental shooting.

State's instruction No. 9 told the jury that as between murder in the first degree and murder in the second degree, voluntary drunkenness may be a legitimate subject of inquiry, but as between murder in the second degree and manslaughter it is never material and cannot be considered. It is contended that this instruction on intoxication is erroneous because it ignores the defense of accidental shooting and assumes that a crime was committed, and that the accused interposed a defense of drunkenness. It is pointed out that intoxication is not set up as an excuse for the crime but only as a contributing cause to the unfortunate and regretable act which might not have occurred if the three young men present at the time had not been drinking. We do not believe that this argument is sound. This is not a binding instruction. It was the contention of the state that the killing was not accidental, and in conformity with this theory, it had a right to have the jury instructed regarding the extent to which they could consider the undisputed fact of the defendant's intoxication at the time of the shooting, if they refused to accept his defense set out in instructions given on his behalf. ''The giving of an instruction based on one theory, unless binding, is not to ignore other theories or instructions based thereon, though the theories upon which such instructions are based be inconsistent. The object and office of an instruction is to define for the jury, and to direct their attention to, the legal principles which apply to, and govern, the facts,

proved or presumed, in the case.'' *State* v. *Clark,* 64 W. Va. 625; *State* v. *Long,* 88 W. Va. 669.

The defendant also claims that the instructions taken as a whole fail to submit to the jury the question of a finding as to manslaughter. State's instruction No. 1 enumerated the verdicts which might be found under the indictment, including that of voluntary and involuntary manslaughter, and defined each of them. The defendant's instruction No. 4, given, told the jury that if they believed from the evidence beyond a reasonable doubt that the defendant was guilty but had a reasonable doubt as to the grade of the offense of which he was guilty, that of murder in either degree, or manslaughter, voluntary or involuntary, they could only find him guilty of the offense in the lower grade. The question of manslaughter was therefore before the jury. It probably was not stressed as much as it could have been, but if there was any error in this, it arose by reason of the defendant's failure to request more instructions on this point, due in all probability to his effort to secure an acquittal upon the ground of accidental shooting.

Error is assigned in that the verdict is contrary to the law and the evidence. It is claimed that to sustain a conviction of murder in the second degree the element of malice must appear beyond a reasonable doubt. In the evidence which has been detailed at a considerable length herein, we think there is sufficient to justify a finding that the defendant's conduct in the reckless handling of the dangerous weapon was of such a nature as to warrant the implication of malice. See JUDGE BRANNON's concurring opinion in *State* v. *Cross,* 42 W. Va. 253, 261.

A careful examination of the entire record reveals that the defendant has had a fair trial, and we are of the opinion to affirm the judgment of the trial court.

*Affirmed.*