STATE OF WEST VIRGINIA

*v.*

JENNINGS ROSCOE BAIL

(No. 10684)

Submitted January 26, 1955. Decided March 15, 1955.

HAYMOND and BROWNING, JUDGES, dissenting.

*M. E. Boiarsky, D. L. Salisbury, E. L. Eakle,* for plaintiff in error.

*John G. Fox,* Attorney General, *Cletus B. Hanley,* Assistant Attorney General, for defendant in error.

GIVEN, JUDGE:

The grand jury in the Circuit Court of Clay County, on June 3, 1953, returned an indictment against Jennings Roscoe Bail, charging that he "on the ___ day of May, 1953, in the said County of Clay, feloniously, wilfully, maliciously, deliberately and unlawfully did slay, kill and murder one Charles Frame * * *". On the following day defendant entered a not guilty plea to the charge. On the fifteenth day of the same month, the court entered an order continuing the trial of the case unto a special term of the court to be held on the 27th day of July, 1953, and set the case for trial on that day. By the same order the court found "that qualified jurors, not exempt from serving, cannot be conveniently found in this county for the trial" of the case, and ordered that eighty jurors be drawn from Braxton County to attend for service as jurors in Clay County on July 27, 1953. Pursuant to the order, jurors were summoned from Braxton County. The jurors so summoned appeared before the Circuit Court of Clay County and from that venire a panel of twelve jurors was duly selected and qualified. After hearing the evidence, the jury returned a verdict finding defendant guilty of murder of the second degree and the court sentenced him "at a term of

confinement in the Penitentiary of this State generally". This Court granted a writ of error to defendant.

For some time prior to the death of Frame there existed a strike engaged in by some of the employees of the Elk River Coal and Lumber Company, and probably others. This group may, for convenience, be referred to as strikers. Opposing the strikers was a group of other employees of the company. For convenience, this group may be referred to as employees. Over the period of the strike, large numbers of strikers and employees were active participants in behalf of either the strikers or the employees. Intense bitterness between the groups developed and possibly continued in intensity until the death of Frame. The principal point of the operations of the strikers appears to have been at "Widen Hill", a point on the public highway leading from Dundon, in Clay County, in a northeasterly direction through Dille, also in Clay County. At Widen Hill a road, apparently a private road over property owned by the Elk River Coal and Lumber Company, intersects the public highway and leads to the town of Widen, the principal point of large coal operations of that company, about one mile from Widen Hill. Following the public highway from Widen Hill toward Dille, about nine tenths of one mile, is found the point where Frame was killed. Across a small stream from that point, and to the left looking toward Dille, is the property referred to throughout the record in this case as the cookshack. Continuing on the public highway, about one half mile, is the village of Dille.

The cookshack, of cinderblock construction, about 25 feet by 44 feet in size, situated on a parcel of about four acres of land owned by Dewey Triplett, one of the strikers, was used by the strikers for the purpose of cooking, eating, and gatherings of the strikers generally, when not actively engaged on the picket lines. On the parcel of land owned by Dewey Triplett there were located, at the time of the homicide, in addition to the cookshack, three small dwellings and a trailer used as a residence. Shortly after midnight of May 6, 1953, a number of automobiles, estimated by witnesses to have been from twenty five to one hundred,

referred to throughout the record as a convoy, being driven by individuals of the group opposing the strikers, drove from Widen Hill to Dille, and from Dille back to Widen Hill, passing the cookshack in going to Dille and again in returning to Widen Hill. There is much confusion in the record as to just what was done or said by those riding in the convoy at the times the convoy passed the cookshack. The strikers testified in large numbers to the effect that there were much soundings of horns, cursing of the strikers and threats against the strikers; to the effect that they would be attacked by the employees, about four o'clock of the same morning. These matters were denied by those riding in the convoy who testified, except that several persons riding in the convoy testified to the effect that there was blowing of horns while the convoy was passing the cookshack. Shortly after four o'clock of the same morning a second convoy, consisting of a number of automobiles, probably eleven, drove from Widen Hill toward Dille and, while passing the cookshack, were shot into by the strikers, located in or about the cookshack. Frame, who was driving the leading automobile in the second convoy, was killed, and others of the convoy were wounded and bullet holes were found in a number of the automobiles in the convoy. Again the evidence is highly conflicting, at least twenty seven witnesses on behalf of the strikers testifying to the effect that those in the convoy fired at or toward those at the cookshack. Several of these witnesses testified to the effect that shots were fired from the leading automobile, the one being driven by Frame. There appears to be no question that several of those riding in the convoy, probably special deputy sheriffs, possessed firearms at the time, and nineteen guns were found at the cookshack, or in or about the residences on the Triplett property, shortly after the shooting. Within a short time after the shooting, members of the Department of Public Safety arrived at the cookshack and arrested those found at or about the cookshack, including the defendant. There is much evidence tending to establish that the strikers, on or shortly before the day of the

shooting, received information to the effect that those at the cookshack would be attacked about four o'clock of the morning on which the shooting occurred. Several of the members of the Department of Public Safety testified to the effect that some of the strikers had, about that time, requested protection from such an attack. There seems to be no question that the pickets had ceased to maintain a picket line at Widen Hill before the day of the shooting, the pickets contending that they had been driven from Widen Hill by the employees, and the employees contending that the pickets had voluntarily ceased the picketing at that point. Several witnesses testified to the effect that no such convoys as those mentioned above were operated previously to the morning of the shooting, and that no change or shift of workers at the Widen mines was to take place until seven o'clock A. M., about two and one half or three hours later than the time of the shooting. The employees contended that the convoys were operated for the purpose of conveying or escorting employees from Dille to Widen Hill, or from Widen Hill to Dille. There was no evidence of any picket line at or near the cookshack.

At the special term of the Circuit Court of Clay County called for July 27, 1953, before the impaneling of the jury, defendant was permitted to withdraw his plea of not guilty. He then filed a plea in abatement attacking the action of the court in drawing the jury from Braxton County, and moved the court to grant him a trial upon the indictment before a jury composed of jurors of Clay County. The State filed its answer to the plea, duly verified, alleging facts contended sufficient to show justification for the summoning of the jury from Braxton County, and also moved that the answer be treated as an affidavit of the Prosecuting Attorney of Clay County. Defendant replied generally to the answer.

The plea of defendant, complaining of the summoning of the jury from Braxton County, alleges facts to the effect that: The indictment upon which defendant was to be tried was returned by a grand jury of Clay County; that the jurors summoned for the trial were from Braxton

County; that the population of Clay County was 14,961; that the voting population of Clay County was 7,228; that there were "3,767 men between the ages of 21 and 65 years eligible for jury service in said County of Clay in said state"; that only 110 jurors were summoned at the regular June, 1953, term of the Clay County Circuit Court; that a "fair and impartial jury could have been obtained from the lists of qualified and eligible voters in the said County of Clay in said state"; that the regular jury commissioners of the Circuit Court of Clay County, in August, 1952, caused a list of 200 names of eligible jurors to be placed in the jury box; that in June, 1953, an additional list of 100 eligible jurors was placed in the jury box; that at the time of the summoning of the jurors from Braxton County, there remained in the jury box names of 50 inhabitants of Clay County eligible for jury service in that county; that no effort was made to determine whether the 50 inhabitants of Clay County, whose names remained in the jury box, could qualify as jurors for the trial of defendant; and that no effort was made to call other inhabitants of Clay County for service as jurors in the trial of defendant.

The answer to the plea alleges facts to the effect that: The offense of which defendant was charged arose out of a strike; that the striking employees formed and maintained picket lines at certain strategic points; that hostile feelings arose between the strikers and other employees; that large numbers of strikers assembled at the points where picket lines were established, especially at Widen Hill; that a great number of offenses were committed by one or the other of the groups; that the result of such activities created a "quasi state of feud"; that much publicity was given to the existing conditions; that the general feeling throughout the county was of hostility or sympathy toward the cause of the strikers; that at the June term, 1953, of the Circuit Court of Clay County, Virgil Nelson and others were indicted by a grand jury of Clay County for offenses growing out of the strike; that difficulty was experienced in obtaining a panel of 20 qualified jurors from the venire called for the June term; that after a

panel of 20 jurors was finally obtained to try Nelson, "it was the general feeling on the part of experienced counsel representing the State that the jury so selected and impaneled was divided in their emotions and opinions in relation to the issue to be tried", and that a "hung jury" resulted; and that later the court attempted to impanel a jury for the trial of Jack Lanham, for an offense growing out of the strike, but that the entire venire attending the court was exhausted without obtaining a panel of 20 jurors who could qualify.

Filed with the answer to the plea, and requested by the State that it be treated as a part of the answer, was a report of the grand jury attending the Clay County Circuit Court for the February term, 1953, wherein may be found statements to the effect that: The grand jury had examined 37 witnesses relating to "lawlessness" in Buffalo District of Clay County; that "almost a complete state of anarchy existed in that District" between late in September until about November 20, 1952; that citizens were denied the right to work, and denied protection of rights and property by large crowds armed with clubs, rocks, and other weapons, especially at Widen Hill; that automobiles were shot into, overturned and otherwise damaged; that railroad bridges were blown up; and that "The effects of this permitted lawlessness have been far reaching. The economic loss to the area reaches into the hundreds of thousands of dollars and affects everyone. Danger to travellers of the roads make normal social life impossible throughout the District * * *". The court overruled defendant's exceptions to the filing of the answer and grand jury report, but afforded defendant opportunity to produce proof relating to the necessity of summoning the venire from Braxton County.

The parties stipulated to the effect that: The population of Clay County in 1950 was 14,961; that there was a registered voting male population, at the time of the entry of the order directing the drawing of a venire from Braxton County, of 3,767, between the ages of twenty one years and sixty five years; that from the 110 petit jurors sum-

moned to serve at the June, 1953, term, a panel of 20 was qualified to try the Nelson case; that there were only three drawings from the jury box for the June term; that 30 names remained in the jury box; that no additional list of jurors from Clay County had been prepared; that the jury commissioners of Clay County had not informed the court that additional jurors could not be conveniently found in said county; and that no additional efforts were made to secure a jury from Clay County.

Except as permitted by statute, trial of a defendant in a felony prosecution must be in the county wherein the offense is alleged to have been committed, before a jury composed of jurors of that county. See Section 14, Article III, State Constitution; Code, 52-1-4; *State* v. *Overholt*, 111 W. Va. 417, 162 S. E. 317; *Ex Parte: Brinkman*, 93 W. Va. 351, 116 S. E. 757; *State* v. *McAllister*, 65 W. Va. 97, 63 S. E. 758; *State* v. *Hobbs*, 37 W. Va. 812, 17 S. E. 380; *McNeeley Ex Parte*, 36 W. Va. 84, 14 S. E. 436; *State* v. *Lowe*, 21 W. Va. 782. Only upon petition of an accused, and then only after good cause shown, may the venue of the trial of a criminal case be removed to a county other than the one wherein the offense was committed. Section 14, Article III, State Constitution; Code, 62-3-13. Whether a defendant has established good cause warranting a change of venue rests very largely within the discretion of the trial court. *State* v. *Pietranton*, 138 W. Va. 776, 84 S. E. 2d 774.

The only authority warranting the calling of jurors for the trial of a criminal case from a county other than the county wherein the crime is alleged to have been committed, is found in Code, 52-1-20, the pertinent part of which reads: "In any criminal case in any court, if in the opinion of the court, or the judge thereof in vacation, qualified jurors, not exempt from serving, cannot be conveniently found in the county in which the trial is to be, the court, or the judge thereof in vacation, shall enter an order of record to such effect, and may cause so many of such jurors as may be necessary to be summoned from any other county. In such order the court, or the judge thereof in vacation, shall fix a day on which such jurors

shall be required to attend, and in such order shall be indicated the county from which such jurors shall be drawn, and the number of such jurors to be drawn * * * Thereupon, a writ of venire facias shall be issued by the clerk of the court wherein the trial is to be, directed to the sheriff of the county wherein such jurors have been drawn, commanding him to summon the jurors so drawn to attend for jury service in the county wherein the trial is to be upon the day named in the writ. Such jurors shall attend for the purpose of the trial, and the jury shall be selected in the manner provided by law * * *".

The questions before the court relating to the calling and qualifying of the jurors who were selected to try defendant, impaneled from the venire drawn from Braxton County, are clearly pointed out by the trial judge, in the overruling of defendant's motion to set aside the verdict, in this pertinent language: "If there has been any error, in the opinion of the Court, it is on the matter of calling this jury from Braxton County, which I frankly admit I am not too sure whether or not I have erred in doing that. If it is the law that the Court could act only upon what would appear in the record in the trial of this case in justification of the action of the Court in bringing the jury from another county, then, clearly, I think I have erred, and the verdict ought to be set aside * * *.

"At the time of the action of the Court in bringing this jury from Braxton County, I was of the opinion that the Court could take notice—perhaps not judicially—of existing conditions in the county at the time of the calling of the case for trial. It is true that the trial of the one case and the attempted trial of the second case, the background of which was quite similar, or the same, as the present case, had some influence and bearing upon the Court on the action taken, but that was not all. Ever since this trouble occurred or began in September of 1952, I have been in constant touch with the citizens of Clay County. I have received petitions and letters from groups and individuals from all parts of Clay County, either promoting the cause of the Widen workers or pro-

moting the cause of the pickets. I have heard it discussed orally in Clay County, and I have read about it in the two local newspapers, one of which seemed to favor one side, and the other favoring the other side. I have been in more or less constant touch with the officers and state police, and for some period of time they called me every day on the telephone, at my request, informing me as to the conditions existing in Widen, at the top of the hill, and the vicinity around where this trouble was occurring. And it was largely upon that, and the information I had that Clay County was so equally divided in sentiment for and against the pickets and for and against the workers, that I did not believe it was possible to get a jury that would qualify here, and, although twenty might qualify under their voir dire as to their qualifications, and attempt to do so honestly, nevertheless, there would be some feeling of prejudice or interest whereby they might feel, and honestly so, that they could not render a fair and impartial verdict, or when qualified, could not go into the jury room and bring out a verdict that was entirely free of prejudice or interest or bias in the matter, and it is largely based upon that that I summoned this jury from Braxton County".

In *State ex rel. Cosner* v. *See,* 129 W. Va. 722, 42 S. E. 2d 31, this Court carefully reviewed the right of a defendant in a criminal case to be tried by a jury of the county wherein the crime of which he is charged is alleged to have been committed, and found the statute quoted above to be not violative of any provision of the State or Federal Constitutions. In the *Cosner* case, one in prohibition, this Court prohibited the trial court from proceeding with the trial of a defendant indicted for murder in Mineral County, before a jury drawn from Tucker County. Of the original venire drawn from Mineral County for the term of court at which Cosner was to be tried, thirty eight jurors appeared on November 6, 1946, and from those appearing only eight were accepted as being qualified. The trial judge then suggested that he believed it impossible to obtain an impartial jury from Mineral County, and that a jury should be drawn from another

county. Both the state and the defendant objected to the drawing of the jury from another county, and an additional forty jurors were summoned from Mineral County. Twenty eight of those so summoned appeared, and of the twenty eight, only two were found qualified. The trial court again expressed the view that an impartial jury could not be obtained from Mineral County. The State and the defendant moved the court to call fifty additional jurors from Mineral County, which motion was denied, but the court did call forty additional jurors from Mineral County, and required that they report on November 7, 1946. Thirty of such additional jurors appeared, of which nine qualified, making a total of nineteen qualified jurors, but who were subject to further examination and challenge. Request of defendant that other jurors be called from Mineral County was denied. The court then directed that forty eight jurors be summoned from Tucker County. In support of Cosner's objection to the calling of the jury from Tucker County, he offered proof to the effect that only 128 of the 513 persons whose names appeared on the current list of available jurors of Mineral County had been summoned; that 385 persons remained on the jury list who had not been called; that the population of Mineral County was approximately 21,000 persons; and that there remained at least 2,000 available jurors of Mineral County who had not been called. Upon these facts, this Court held that Code, 52-1-20, "* * * properly construed, requires a defendant in a criminal case to be tried in the county in which the offense is alleged to have been committed, by a qualified jury of that county, unless it clearly appears that such jury can not be found in that county, in which event the trial court is empowered by the statute to cause to be summoned as many qualified jurors as may be necessary from some other county; and, as so construed, the statute is not violative of any provision of the Constitution of this State." In the opinion, the Court stated: "The undisputed facts * * * clearly indicate the absence of any showing that even a reasonable possibility existed that sufficient qualified jurors could not be found in Mineral County to accord the defendant an impartial trial in

that county, at the time the jurors were summoned from Tucker County to attend the Circuit Court of Mineral County for the trial".

In *State* v. *McCoy,* 91 W. Va. 262, 111 S. E. 125, upon an indictment for murder alleged to have been committed in Mingo County, an order was entered by the trial court, without any notice to defendant, upon affidavits of the jury commissioners and the sheriff of the county, directing the summoning of a jury from another county. This Court held that, notwithstanding Code, 52-1-20, contained no provision requiring notice to a defendant before the entry of such an order, requirement of notice would be implied, and held that the entry of the order directing the calling of the jury from another county without such notice constituted such a violation of defendant's rights as to require a reversal of the judgment of conviction. In the opinion, the Court stated: "The statute does not in terms require notice to defendant; but in so important and vital a matter as the constitution of the jury or the place of trial, can it be assumed that the Legislature intended that the proceedings authorized should take place without notice to or in the absence of one accused of a felony? If it had been a motion by the prisoner for a change of venue, the State would have been entitled to a hearing and to oppose and even defeat the prisoner's motion unless good cause was shown therefor. In effect the summoning of a jury from another county amounts to a change of venue, and to give the statute a construction that would deprive one accused of crime of the right to be heard thereon, would at once condemn the law as invalid." See *Newberry* v. *Commonwealth,* 192 Va. 819, 66 S. E. 2d 841; *Richards* v. *Commonwealth,* 107 Va. 881, 59 S. E. 1104; *Page* v. *Commonwealth,* 27 Gratt. 954; *Beach* v. *Commonwealth,* 246 S. W. 2d 587 (Ky.); *Osborne* v. *Commonwealth,* 296 Ky. 587, 177 S. W. 2d 896; *State* v. *Collins,* 2 N. J. 406, 67 A. 2d 158.

Though Code, 52-1-20, is not unconstitutional as depriving a defendant in a criminal proceeding of a right to be tried by a jury of the county wherein he stands indicted,

the authorities make it clear that such a defendant has the right to be tried by a jury of his own county, unless a fair and impartial jury can not be reasonably obtained therein. Therefore, it is clear that a defendant in such a case has the absolute right to be heard and to require that proof be produced establishing that a fair and impartial jury can not be obtained in the county of venue. In the *Cosner* case, *supra*, the rule was laid down that such facts must be "clearly" established. Therein it was held: "4. Unless it clearly appears that a qualified jury can not be obtained at the time of trial, in the county in which the offense is alleged to have been committed, for the trial of the defendant in a criminal prosecution in that county, the court in which the prosecution is pending exceeds its legitimate powers under the statute, Code, 1931, 52-1-20, in causing jurors to be summoned from another county for the trial of the defendant."

The holding is clearly in accord with Code, 52-1-20. While the statute permits the entry of an order directing the drawing of a jury from a county other than that of venue, "if in the opinion of the court * * * qualified jurors * * * can not be conveniently found in the county", the statute contains the further definite and pertinent provision that the court may "cause so many of such jurors as may be necessary to be summoned from any other county". Notice the very significant use of the word "necessary". It can not, we think, be doubted that there must be a showing of necessity for the refusal of a court to grant a defendant a trial by a jury of his own county before the impaneling of a jury from a different county. Neither can it be doubted that the facts establishing such necessity must appear in the record of the case. To hold otherwise would vest in the trial court an arbitrary power or discretion, not reviewable by any appellate court.

The State argues that the determination of the question whether an impartial jury could be had in the county of venue, in the first instance, at least, rests with the trial court, and that the trial court in the instant case, in the exercise of its discretion, found that a fair and impartial

jury could not be had in Clay County. The State would say that the question of the necessity for a change of venire is analogous to the question of a change of venue, and cites cases holding that questions relating to the granting of a change of venue are addressed to the sound discretion of the trial court, and that the finding of a trial court in relation thereto is seldom disturbed by an appellate court. The analogy is somewhat apt, but differences are involved. Only a defendant can move for a change of venue, while either the defendant or the State may move for a change of venire, and the court on its own motion may, at least, enter the initial order necessitating the investigation as to whether an impartial jury may be had in the county of venue. The burden of proof upon a motion for a change of venue is always upon the defendant. Upon a motion for a change of venire, the burden of proof may or may not be on the defendant. We think of no sound reason, however, why the exercise of a sound discretion by a trial court should be regarded more favorably in one case than in the other. Of course, as to the change of venire, where defendant opposes, the fact of the "necessity" for the change must "clearly" appear. This brings us to the contention of the defendant that the record before the trial court did not support its holding to the effect that a fair and impartial jury could not be had in Clay County.

An attempt has been made above to indicate, in much detail, the proof offered by the State and the defendant upon the question. After a careful appraisal thereof, we are of the opinion that the record fails completely to "clearly" establish that a fair and impartial jury could not have been obtained from available jurors of Clay County. In the first place, the State produced no evidence to support the drawing of the jury from Braxton County, except the answer verified by the affidavit of the prosecuting attorney, and the report of the grand jury. Many of the allegations set out in the answer are of such nature as to make it apparent that they constituted merely the opinion of the prosecuting attorney. The acts of violence,

many of which occurred some considerable time before the calling of the jury, and the existing strike difficulties in and about Widen, recited in the answer, hardly convince that persons in distant parts of the county, available for jury service, could not be qualified. The difficulty or inconvenience in the qualifying of the jury in the *Nelson* case appears not greater than often experienced in such trials, and a jury was obtained for the trial of that case. The fact that the jury were unable to agree is no indication that the members of the jury were biased. The inability to agree may have resulted from any one of many circumstances. It is not indicated why a greater difficulty should exist in the acquiring of a jury for the trial of the defendant in the instant case than for the trial of the defendant in the *Nelson* case. The facts recited as to the attempt to obtain a jury in the *Lanham* case are not helpful. Apparently, from such recitals, the list of jurors "then attending the court" was exhausted without obtaining a panel of 20. No further effort appears to have been made to secure other jurors. How many jurors were attending the court is not shown. How many of a panel of 20 were found qualified is not indicated. The action of the court in filing the grand jury report was objected and excepted to by defendant, and its use seems doubtful. The report was apparently based on testimony of witnesses testifying at the instance of the State, and the defendant had no opportunity, and no opportunity could have been afforded him, to cross-examine such witnesses. Moreover, the determination of such matters, and the making of such a report, are not within the province of a grand jury.

The facts stipulated by the parties indicate a strong probability that an impartial jury could have been obtained from Clay County. The area of Clay County is 346.61 square miles, composed of five districts and, according to the 1950 census, "contained a population of 14,961". At least 3,767 persons of that county appear to have been available for jury service. Only 300 names of jurors had been placed in the jury box between August, 1952, and June, 1953; 30 remained in the jury box at the end of

the June, 1953, term of court. No effort was made to call other jurors from Clay County, and no effort was made to qualify a jury in the present case. The conclusion reached here, that the evidence in the record is insufficient to clearly establish that an impartial jury could not have been obtained in Clay County, appears to be in accord with the view and appraisal of such evidence by the trial judge. In stating his reasons for denying defendant's motion for a new trial, he said: "If it is the law that the Court could act only upon what would appear in the record in the trial of this case in justification of the action of the Court in bringing the jury from another county, then, clearly, I think I have erred, and the verdict of the jury ought to be set aside * * *". It was, therefore, only on the belief of the trial judge that facts not shown by the record, but peculiarly within his personal knowledge, were sufficient to warrant such action, that the drawing of the jury from Braxton County was based. As above noted, to hold that a defendant be required to accept trial by a jury of a county other than that of venue, merely upon the opinion of the trial judge, based on facts not shown in the record, would effectively preclude a defendant from obtaining a review of the trial court's action in ordering that the jury be drawn from another county. There would be no possible way for the appellate court to appraise the facts upon which the discretion of the trial court was based. We think a defendant can not be so denied his privilege of having a review of the action of a trial court involving such an important right. We can not say that the Legislature had any such intention. To so construe or apply the statute would involve serious questions of due process. In *Fannon* v. *Commonwealth,* 295 Ky. 817, 175 S. W. 2d 531, the Court said: "* * * We do not think it can be said to constitute an honest, fair effort to obtain a jury locally merely to draw on the court's personal knowledge of the situation and on evidence heard on a motion for a change of venue. There should have at least been some attempt or test by examination of prospective jurors."

In the *Cosner* case, in the *McCoy* case, and in this opinion, references are made to the number of jurors supposed to be available in the respective counties of venue, as well as to numbers of jurors called in attempts to obtain qualified juries. Such references, and other facts recited, are not made for the purpose of indicating that a trial court must order the drawing of every available juror, or of any percentage of available jurors of a county, before directing the impaneling of a jury from another county. Such a rule would, in many cases, at least, have the effect of denying to the State, or to the defendant, a fair and impartial jury. We think no definite rule can be formulated which would define the precise requirements of a clear showing necessary under the statute. The facts of each particular case, for the most part, will necessarily be so different, and so unforeseeable, that no attempt should be made to formulate an all-inclusive rule. For the present, we think, it will be sufficient to say that we perceive no difference in the requirement as to proof of a clear showing, under Code, 52-1-20, and the requirement of proof to clearly establish a fact in any other case.

Defendant contends that the evidence before the jury was not sufficient to support a verdict of guilty of murder of the second degree. The contention raises questions as to the sufficiency of the proof to establish, to the exclusion of every reasonable hypothesis save that of guilt, the evidence in part being circumstantial, that defendant fired the fatal shot.

Shortly after the shooting, the automobile which was being driven in the second convoy by Frame was observed off the public highway, sitting upright over the bank of a small stream, possibly 250 or 300 yards from the cookshack, toward Dille. Frame, who apparently was the only person in the car at the time of the shooting, a few minutes later was found to be dead. It was established that he died instantly, as the result of a bullet, or fragment of a bullet, which entered his forehead, near the right temple, and made its exit from the rear of the head, probably to

the left of the center and lower than the point of entrance. Several hours later, after the car had been removed from the place of the shooting to a garage at Clay, there was found in the car a copper jacket, or part of a jacket, off a bullet fired from "a .35 caliber—it is a fragment or portion of a .35 caliber bullet which has been fired in a rifle having seven lands and grooves". It was also established that defendant fired several shots into or toward the second convoy from a .35 caliber rifle having "seven lands and grooves". Upon careful examination of the automobile in which Frame was killed, it was found that "one bullet had struck the divide between the ventilator and the door glass cutting a piece out of the ventilator glass and extending itself into the frame of the automobile. Another one had entered the left door frame * * * there is another bullet hole * * * in the left rear door glass of the 4-door 1951 Chevrolet sedan in which the victim was killed. Exhibit No. 12 shows the point of exit of a bullet near the center of the right windshield * * *". It was also established that no bullet entered the automobile from its right side. No .35 caliber rifle, other than the one fired by the defendant, was found on the premises about the cookshack, or in possession of any person found there. No witness testified to the fact that every person present at the cookshack at the time of the shooting was present upon the arrival of officers a short time later, or that any person participating in the shooting left that point before the arrival of officers.

We are of the opinion that the facts detailed are sufficient to warrant a finding by the jury that Frame was killed by a shot fired by defendant. We recognize the mere possibility that some person other than defendant may have fired that shot. The circumstances are such, however, that the possibility must be considered as extremely unlikely. The State was not required to establish such facts beyond every possibility, but only to the exclusion of every "reasonable hypothesis" save that of guilt. See *State* v. *Allen,* 139 W. Va. 818, 82 S. E. 2d 423; *State* v. *Burford,* 136 W. Va. 472, 67 S. E. 2d 855; *State* v. *Hunter,*

103 W. Va. 377, 137 S. E. 534. That Frame died of a gunshot wound is not questioned. That defendant fired at the convoy several times is admitted. That the caliber of the rifle used by the defendant was the same as the caliber of the bullet the jacket of which was found in the automobile in which Frame was riding, seems certain. It being established that no bullet or fragment of any bullet entered the Frame car except from its left side, such fact seems to make it reasonably certain that the bullet came from a gun fired at or near the cookshack, notwithstanding the bullet or fragment entered Frame's head near the right temple. It is not strange, in such circumstances, for a bullet to ricochet, and the course of a ricocheting bullet can not usually be determined. That the bullet did ricochet seems certain, since no bullet entered the right side of the car, and no bullet, or fragment, except the one mentioned, was found in the automobile which Frame was driving. It is possible, of course, that Frame, after passing the cookshack, turned his head back so as to permit a bullet to enter the right side of his head. That he would do so, in such circumstances, appears more doubtful than that he was struck by a ricocheting bullet. Such questions, however, have no controlling effect. The question here is whether Frame was struck by a bullet, or a part thereof, from a rifle fired by defendant. That some one of the strikers other than defendant may have fired the fatal shot from some other .35 caliber rifle, and left the scene, with the rifle, without having been observed, is a mere possibility. Officers riding in the convoy covered the public road leading from the cookshack toward Dille almost immediately after the shooting. Others of the convoy were in or along the public road, between the cookshack and Widen Hill, from the time of the shooting until officers appeared. Such facts, together with other facts recited, we think, exclude any "reasonable hypothesis" that any person left the scene before the arrival of the officers.

After defendant was arrested and placed in jail, a statement was signed by him before members of the Depart-

ment of Public Safety, which differs in some material respects from his testimony. The statement was made eighteen or nineteen hours after his arrest, about two o'clock A. M. of May 8. It was testified to that the statement was made by defendant voluntarily, of his own free will, without any threats being made, and without any promises. The defendant testified, on examination before the court, and out of the presence of the jury, to the effect that the statement was not voluntarily, and that certain threats had been made against him by officers for the purpose of inducing him to make the statement. The trial court admitted the statement in evidence, but left to the jury questions relating to its execution. An examination of all the evidence relating to the point convinces us that the action of the trial court was proper. See *State* v. *Brady,* 104 W. Va. 523, 140 S. E. 546; *State* v. *Richards,* 101 W. Va. 136, 132 S. E. 375.

Defendant complains of several actions of the trial court relating to the admission of evidence. It is contended that the metal fragment of a bullet found in the Frame car, admitted in evidence, was not shown to have been fired from the gun of defendant, or to be the bullet which actually killed Frame. It is true that the firearms expert testified that "I cannot say definitely that it was fired through this gun"; but other facts and circumstances detailed herein, in the discussion of the sufficiency of the evidence, make it clear, we think, that the questions raised were properly submitted to the jury.

Certain questions were asked Dewey Triplett by the State on cross-examination, and answers were made, relating to the receiving of money from the United Mine Workers of America, or local organizations of that union, and the expenditure thereof. Defendant contends that such testimony was prejudicial, as showing that the union was supporting the strike. We think there was no prejudicial error. The testimony indicated some probable interest of the witness. Moreover, throughout the trial witnesses testified to the effect that some of them were employees of the company or members of the union. *State* v. *McKinney,* 88 W. Va. 400, 106 S. E. 894.

Stanley Eagle, a witness for the State, was questioned about facts relating to bullet holes in an automobile in which a witness was riding in the second convoy. The basis of defendant's objection to this evidence seems to be that the automobile concerning which the witness was testifying was not the automobile in which Frame was killed, and that the State had not established that the bullet holes in the automobile were the result of the shooting of the gun by defendant. We see no prejudicial error here. The State was entitled to show the general result of the shooting by the strikers.

At the time of the arrest of those found in or about the cookshack, a short time after the homicide, there were found in the possession of such persons, or in or about the buildings on the Dewey Triplett property, fourteen rifles and shotguns and five pistols. These guns, other than one pistol and one shotgun, were introduced in evidence and exhibited to the jury. The basis of the objection of defendant to the introduction of these guns as evidence is that the State had not shown that the guns were used by anyone engaged in the shooting. Examining the evidence relating to the point, we notice that the trial court was very careful to require a showing by the State that the guns so admitted were "found by the officers either on some individual or in his possession at the scene of the crime shortly after that, or in one or the other of these buildings at the scene of the alleged crime". In the circumstances of this case, we see no prejudicial error in receiving or exhibiting the guns. It was the contention of the State that a large number of shots were fired at the convoy without warning, from different points about the Triplett property. The presence of the guns on the Triplett property would have a bearing on that question. Moreover, the State was entitled to offer proof to establish that the rifle used by defendant was the only rifle used by the strikers of the same caliber as the bullet which killed Frame. See *State* v. *Cook*, 81 W. Va. 686, 95 S. E. 792; *Dean* v. *Commonwealth*, 32 Gratt. 912.

The only other question relating to the admission of

evidence which we need consider relates to the six .35 caliber rifle cartridge cases found near the cookshack on the morning of the shooting, but several hours later. It was not, and hardly could have been, shown when the cartridges were fired. The shells were delivered to a fire-arms expert, a member of the Department of Public Safety, who had also received the rifle used by defendant, and who, after examinations and tests, testified: "The six cartridge cases which were delivered to me by Sgt. S. L. Warren which are .35 caliber Remington cartridge cases had been fired in Remington rifle No. 625, which was delivered to me by Major C. P. Taylor, and which is now on the table". In view of this testimony, we think it clearly apparent that the cartridge cases were properly admitted. They, along with other evidence, constitute the facts from which the jury were justified in saying that the fragment of the jacket of the bullet that killed Frame came from the gun used by defendant. See *State* v. *Davis,* 74 W. Va. 657, 82 S. E. 525.

Defendant contends that the court erred in the giving unto the jury of each of State's Instructions Nos. 1, as modified, 6, 7, 12 and 13. Instruction No. 1, as modified, defined the several offenses charged in the indictment, told the jury that "involuntary manslaughter is where one person unintentionally causes the death of another person while engaged in an unlawful act or by the doing of a lawful act negligently". The instruction is incorrect. The jury should have been told that: "7. The offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another." *State* v. *Barker,* 128 W. Va. 744, 38 S. E. 2d 346. See *State* v. *Lawson,* 128 W. Va. 136, 36 S. E. 26. The State concedes the error, but contends that defendant could not have been preju-diced thereby, since he was found guilty of a crime of higher degree than that to which the instruction related, and that the rule often applied by this Court to the effect that there can be no prejudice to a defendant in the giving

of an erroneous instruction relating only to an offense higher in degree than the offense of which defendant was found guilty, should be applied or adapted to a case like the instant one. See *State* v. *Toler*, 129 W. Va. 575, 41 S. E. 2d 850; *State* v. *Johnson*, 108 W. Va. 630, 152 S. E. 203. The defendant counters by saying that since he was entitled to have the court define for the jury each offense of which he could have been convicted, he was entitled to a correct definition of each offense lesser than the one of which he was found guilty.

We are of the view that defendant was not prejudiced by the giving of the instruction. Such wide differences exist between the correct definition of murder of the second degree, the offense of which defendant was found guilty, and the lesser offense of involuntary manslaughter, that we can not see how defendant could possibly have been prejudiced by the incorrect defining of involuntary manslaughter. See 41 C.J.S., Homicide, Section 427. While it is true that the giving of an improper instruction raises a presumption of prejudice, it is also true that this Court will not reverse a trial court because of an erroneous instruction where it clearly appears that no prejudice has resulted. *State* v. *Hamrick*, 74 W. Va. 145, 81 S. E. 703; *Buffington* v. *Lyons*, 71 W. Va. 114, 76 S. E. 129; *State* v. *Douglass*, 28 W. Va. 297.

State's Instruction No. 6 reads: "The Court instructs the jury that where a homicide is proven by the use of a deadly weapon, such as the case now before you, and a plea of self-defense is relied upon by the defendant to excuse him from such killing, then the burden of proving such self-defense rests upon the defendant, and to avail him the facts and circumstances showing such defense must be established by a preponderance of the evidence, and in determining whether or not such defense has been established by such preponderance of the evidence, the jury should consider all of the evidence introduced both by the State and the defense and circumstances disclosed by such evidence, including a view of the premises by the jury." It is contended by defendant that the giving of the

instruction, in using the language "where a homicide is proven by the use of a deadly weapon, such as the case now before you", had the effect of telling the jury that defendant had done the killing, and constituted prejudicial error. Defendant also contends that the instruction incorrectly stated the law relating to proof of self-defense, in that it did not require the jury to consider "all" of the evidence introduced both by the State and the defense. See *State* v. *Hardin,* 91 W. Va. 149, 112 S. E. 401. The language of the instruction is misleading. The jury could have understood the court to mean that the State had proved that the defendant had committed the homicide by the use of a deadly weapon. See *State* v. *Aliff,* 122 W. Va. 16, 7 S. E. 2d 27. We think the other objection to the instruction without merit. See *State* v. *Hardin,* 91 W. Va. 149, 112 S. E. 401; *State* v. *Manns,* 48 W. Va. 480, 37 S. E. 613.

State's Instruction No. 7 presented to the jury the requirements of proof as to the defense of self-defense, in the circumstances of the instant case. We find no error therein. State's Instruction No. 12, after recognizing the rule relating to reasonable doubt, told the jury "that to authorize an acquittal on the ground of doubt alone, such doubt must be real and substantial, and not a mere possibility that the defendant may be innocent". Other instructions were given relating to reasonable doubt. We find no prejudicial error in the giving of the instruction. *State* v. *Gunnoe,* 74 W. Va. 741, 83 S. E. 64; *State* v. *Waldron,* 71 W. Va. 1, 75 S. E. 558; *State* v. *Abbott,* 64 W. Va. 411, 62 S. E. 693.

State's Instruction No. 13, given to the jury, reads: "The Court instructs the jury that the term 'peaceful picketing' as used in these instructions means that one on strike may gather and collect with his associates likewise on strike and publicly proclaim and tell his grievances to those who will listen, and appeal to such persons for support, and do and take such other peaceful means and measures as may convince fellow employees of the justness of his claim and the objects and purposes of the strike; however, in accomplishing these purposes those so engaged in picketing

have no right to resort to violence; and in the case now before you if you find from the evidence beyond a reasonable doubt that the defendant and those associated with him in the prosecution of their picketing of the Elk River Coal & Lumber Company employees, at the top of Widen Hill or at the cookshack, referred to in the evidence in this case, resorted to violence towards such employees, then, such picketing is not peaceful picketing."

The defendant says that this instruction has no application to the law and evidence in the case, and ignores or prejudices defendant's theory of self-defense. We think the giving of this instruction, in the circumstances of this case, constituted prejudicial error, notwithstanding the instruction is not a binding one. The instruction refers to "violence" of the pickets at Widen Hill or at the cookshack, without regard to time, and without regard to whether the so called "violence" was done in self-defense, as the evidence of defendant relating to the so called acts of violence of the strikers at the cookshack strongly indicates. The jury could have very well understood this instruction to say that any acts of violence, whether in self-defense or not, would make the picketing unlawful, and, therefore, the action of the strikers in shooting into the convoy was not in self-defense. That, of course, was not the purpose of the instruction, for other instructions given to the jury pointed out the right of defendant to shoot in self-defense. Notwithstanding such good instructions, however, we can not say that the defendant was not prejudiced by the giving of State's Instruction No. 13. Though instructions are to be considered as a whole, an error in the giving of a bad instruction is not cured by the giving of a good instruction relating to the same point. *State* v. *Garner,* 97 W. Va. 222, 124 S. E. 681; *State* v. *Ringer,* 84 W. Va. 546, 100 S. E. 413.

Defendant complains of the action of the trial court in refusing to give unto the jury defendant's Instructions Nos. 1, 9 as offered, 12, 13, 14 and 15, and in modifying defendant's Instruction No. 9. Defendant's Instructions Nos. 1, 12, 13, 14 and 15 were peremptory, as to the respec-

tive offenses included in the charge contained in the indictment. As before pointed out, the evidence adduced by the State was sufficient to carry the case to the jury on the charge of which he was convicted. There was, therefore, no error in refusing the peremptory instructions. Defendant's Instruction No. 9 would have told the jury that where a conviction is sought "in whole" upon circumstantial evidence, guilt must be proved beyond a reasonable doubt, and that such evidence must be acted on with caution. The court modified the instruction by striking therefrom the words "in whole" and inserting in lieu thereof the words "at least in part". We think the modification correct. The evidence before the jury was partly circumstantial and partly direct.

The next assignment of error relates to the action of the trial court in overruling a motion for a mistrial, because of certain remarks of counsel for the State, made in the presence of the jury. In referring to certain evidence proffered by the defendant, one of counsel for the State said: "If it is to be introduced in this piecemeal fashion, we can start taking up dynamiting, and the Court will be a long term, your Honor, because there has been plenty of it, and we have carefully refrained from bringing in these other matters." Another of counsel for the State stated: "Did I understand your Honor that on our side of this case we would be permitted on rebuttal to come back with the blowing up of all these bridges and turning over of all these automobiles at the top of the hill on the part of these pickets, and all of these breaking and enterings, and all of that lawlessness that has gone on? Do I understand now that we can go into that? * * * I don't know whether we can connect it up with this killing or not, but it will be a chain of circumstances, your Honor, to make a prima facie case, and that it was done to terrorize these citizens of Widen and these employees that continued to work, and having for its purpose—* * *". While the statements appear highly prejudicial, no objection was made at the time, and the motion for a mistrial was not made until five days after the statements were made. While over-

ruling the motion for a mistrial, the court did instruct the jury to disregard all such statements. In these circumstances, we can not say that defendant was prejudiced thereby.

Defendant contends that the judgment imposing sentence on the verdict is not in accordance with the requirements of Code, 61-2-3, which provides: "Murder of the second degree shall be punished by confinement in the penitentiary not less than five nor more than eighteen years". As before noted, the sentence was "at a term of confinement in the Penitentiary of this State generally". Code, 61-11-16, dealing with indeterminate sentences, provides: "Every sentence to the penitentiary of a person convicted of a felony * * * shall be a general sentence of imprisonment in the penitentiary * * *". We are of the opinion that the sentence is sufficient in form. In *Cohn* v. *Ketchum,* 123 W. Va. 534, 17 S. E. 2d 43, wherein the sentence for one year imposed on a defendant had been interpreted by the Warden of the State penitentiary as being for five years, it was pointed out that in such circumstances "The order of the trial court, sentencing the person convicted, must, under the 'Indeterminate Sentence' Law, be interpreted in the light of the statutes upon which it is based, and the minimum and maximum terms, so fixed by law, should be read into and considered as part of the sentence". A different holding, however, would not necessitate a disturbance of the verdict. If no other reversible error existed, the case would be remanded for the entry of a proper order upon the verdict returned by the jury. See *State* v. *Blankenship,* 137 W. Va. 1, 69 S. E. 2d 398.

A question raised only in the *amicus curiae* brief relates to whether the verdict was justified on the theory that the State proved a conspiracy of defendant and others, and that the death of Frame resulted in the furtherance of the conspiracy, it being contended that defendant would be guilty regardless of whether the fatal shot was fired by defendant or by one of the other conspirators. Code, 61-6-7, provides that: "If two or more persons *** conspire * * * for the purpose of inflicting any punishment or bodily

injury * * * If any person in pursuance of such combination or conspiracy, shall inflict any punishment or bodily injury * * * he shall be guilty of a felony * * * and if the death of any person shall result * * * every person engaged in the commission thereof shall be guilty of murder of the first degree * * * If, upon the trial of an indictment hereunder, it be proved that two or more persons, the defendant being one, were present, aiding and abetting in the commission of the offense charged therein, it shall be presumed that such offense was committed in pursuance of such combination of conspiracy * * *". The indictment, quoted in part in the first paragraph of this opinion, is not one for conspiracy. It hardly seems arguable that a defendant could be indicted in form as was done in the instant case, and thereunder be convicted of murder only because of a conspiracy. The language of the statute, Code, 61-6-7, "If, upon the trial of an indictment hereunder * * *", seems to clearly say that the indictment must be under the statute, charging conspiracy, as well as homicide in pursuance of the conspiracy. It would not be contended, we presume, that the State under the indictment returned against defendant would have the benefit of the presumption mentioned in the statute. Of course, as pointed out later in this opinion, the admission of evidence of a conspiracy upon a trial of murder would not necessarily preclude a verdict of guilty of murder. Neither did the State try defendant upon any theory of conspiracy. The State undertook to prove and, as hereinbefore indicated, we think did prove, facts sufficient to warrant the jury finding that the defendant, not any one of certain conspirators, fired the fatal shot. Neither were the jury instructed to the effect that defendant could be found guilty on any theory of conspiracy. State's Instruction No. 3 would have permitted a verdict of guilty on the conspiracy theory, and was properly refused by the trial court. State's Instruction No. 4 referred to concerted actions of the strikers, but the jury were told in that instruction that only in the event "one of the bullets, so fired by the defendant, struck and killed the deceased", could the defendant be found guilty.

If it be conceded that the language used in the instruction referred to a conspiracy, it amounted to no more than harmless surplusage. Moreover, State's Instruction No. 4 related only to murder of the first degree, a crime of a higher degree than the one of which defendant was convicted. See *State* v. *Croston*, 103 W. Va. 380, 137 S. E. 536; *State* v. *Newman*, 101 W. Va. 356, 132 S. E. 728; *State* v. *Wisman*, 93 W. Va. 183, 116 S. E. 698; *State* v. *Powers*, 91 W. Va. 737, 113 S. E. 912; *State* v. *Stafford*, 89 W. Va. 301, 109 S. E. 326; *State* v. *Cremeans*, 62 W. Va. 134, 57 S. E. 405; *State* v. *McCoy*, 61 W. Va. 258, 57 S. E. 294; *State* v. *Roberts*, 50 W. Va. 422, 40 S. E. 484; *State* v. *Bingham*, 42 W. Va. 234, 24 S. E. 883.

The *amicus curiae* brief relies heavily upon the case of *State* v. *Morgan*, 35 W. Va. 260, 13 S. E. 385. The holding in that case, however, is not authority for the proposition that one indicted for murder in the form of the indictment against defendant can be convicted thereunder of murder by conspiracy under Code, 61-6-7. In the *Morgan* case, the court refused an instruction offered by the defendant, which reads: "The jury is instructed that, if they believe from the evidence in this cause that a conspiracy was formed by the defendant and others associated with her for the purpose of murdering Jacob Morgan, the decedent named in the indictment in this prosecution, then no conviction can be had of the defendant under this indictment." The trial court gave, and this Court approved, an instruction offered on behalf of the State in this language: "If the jury believe from the evidence, beyond any reasonable doubt, that a conspiracy was formed between the prisoner, Mary Jane Morgan, and other persons, whose names are unknown, that the purpose of that conspiracy was to murder Jacob Morgan, and that, pursuant to that conspiracy, the unknown members of the conspiracy, or some of them, killed Jacob Morgan, and that the killing was done with malice aforethought, either expressed or implied, and that the prisoner, Mary Jane Morgan, was present at the time Jacob Morgan was killed, and aided by acts, or encouraged by words or gestures, those actually engaged in said killing,

then said prisoner was a principal in the killing and murder." Notice that the effect of the instruction refused was to direct an acquittal if a "conspiracy was formed", regardless of what the evidence might establish as to the murder of Morgan by the defendant. Notice also that the instruction given required, before a verdict of guilty could be returned, that the defendant must have been "present at the time Jacob Morgan was killed, and aided by acts, or encouraged by words or gestures, those actually engaged in said killing * * *". Some of the observations made in the opinion in the *Morgan* case possibly could be given the meaning contended for in the *amicus curiae* brief. Those observations, however, must be considered in the light of the pertinent facts in the case. The holding is simply to the effect that the evidence of a conspiracy did not render nugatory the evidence of murder.

The judgment of the Circuit Court of Clay County is reversed, the verdict of the jury is set aside, and the defendant is awarded a new trial.

*Reversed;*
*verdict set aside;*
*new trial awarded.*

HAYMOND, JUDGE, dissenting:

The decision of the majority of this Court in this case in reversing the judgment of the Circuit Court of Clay County, which confirmed the verdict of the jury finding the defendant guilty of murder of the second degree and sentenced the defendant to confinement in the penitentiary of this State for that offense, is based on three alleged errors of the circuit court in the trial of this case. These alleged errors are the action of the circuit court: (1) In causing jurors to be summoned from Braxton County for the trial of the defendant instead of selecting a jury from qualified jurors in Clay County for such trial; (2) in giving Instruction No. 6, offered by the State, because it contained the statement "where a homicide is proven by the use of a deadly weapon, such as the case now before you,"; and (3) in giving Instruction No.

13, offered by the State, which related to peaceful picketing. In my opinion none of these alleged errors, considered singly or collectively, justifies the reversal of the judgment of the circuit court and in consequence I dissent from the action of the majority in reversing that judgment and awarding the defendant a new trial.

To support its action with respect to the first alleged error the majority cites and relies upon the decision of this Court in *State ex rel. Cosner* v. *See*, 129 W. Va. 722, 42 S. E. 2d 31. In that case, a proceeding in prohibition, this Court held that Section 20, Article 1, Chapter 52, Code, 1931, which authorizes any court, or the judge of such court in vacation, under certain specified conditions, to cause jurors to be summoned from another county for the trial of a defendant in a criminal case, requires the defendant to be tried in and by a qualified jury of the county in which the offense is alleged to have been committed, unless it clearly appears that such jury can not be found in that county; that in that event the court may cause to be summoned as many qualified jurors as may be necessary from some other county; and that unless it clearly appears that a qualified jury can not be obtained, at the time of trial, in the county in which the offense is alleged to have been committed, for the trial of the defendant in a criminal prosecution in that county, the court in which the prosecution is pending exceeds its legitimate powers under the statute in causing jurors to be summoned from another county for the trial of the defendant. In that case it did not clearly appear that a qualified jury could not be obtained in Mineral County, where the alleged offense occurred, for the trial of the defendant. On the contrary the facts disclosed by the record showed that a qualified jury from Mineral County could have been selected and for that reason this Court prohibited the circuit court of that county from obtaining a jury from another county for the trial of the defendant for an offense alleged to have been committed in Mineral County.

The facts established by the record in the *Cosner* case are entirely different from the facts established by the

record in the case at bar as to the likelihood of obtaining a qualified jury from jurors in the county in which the alleged offense was committed and render the holding of the *Cosner* case that the defendant in that case should not be tried by a jury from a county other than the county in which the alleged offense was committed inapplicable in the instant proceeding.

In the *Cosner* case no industrial or labor dispute, which divided and embittered a large number of citizens available for jury duty, existed in the county in which the alleged offense was committed. In the instant case it appears beyond question that a violent and prolonged industrial and labor dispute, which has divided and embittered great numbers of the citizens of Clay County available for jury duty, existed for many months before the trial of the defendant.

In the *Cosner* case it further appeared that when the trial of the case began eight jurors were accepted as qualified from the thirty eight jurors present in court of the original venire of forty eight jurors; that the judge of the trial court, without suggestion or request from the State or the defendant, at that time expressed the belief that a qualified jury could not be conveniently found in the county and that he should call a jury from another county; that both the prosecuting attorney and the attorney for the defendant urged the court to call fifty additional jurors; that the court refused to do this but, after some hesitation, caused forty more jurors to be summoned; that twenty eight of those jurors appeared during the afternoon session of the court and from that number two qualified jurors were obtained; that with ten jurors accepted as qualified the trial court expressed the view that no more jurors should be called from Mineral County and that a jury should be summoned from another county; that the attorney for the defendant and the prosecuting attorney requested the court to call fifty additional jurors from Mineral County; that the court denied this request but instead directed the clerk to call forty additional jurors to report the following day; that at that time thirty of those additional jurors were present and from

that number nine more qualified jurors were accepted which made a total of nineteen qualified jurors who had been accepted subject to examination and challenge by the prosecuting attorney and the attorney for the defendant; that at that stage of the proceeding the court expressed its intention to summon a jury from another county and refused the request of counsel for the defendant that ten more jurors be called for the purpose of obtaining the one additional juror necessary to complete the panel of twenty jurors. It further appeared that only ninety six jurors had been examined and only one hundred and twenty eight of the five hundred and thirteen persons whose names appeared on the current list of available jurors of the county had been summoned; that three hundred and eighty five persons remained on the jury list who had not been called or examined as jurors; and that from a population of approximately 21,000 persons in Mineral County there were at least 2,000 additional available jurors. Although only one additional qualified juror was required to complete the panel of twenty, and although many apparently qualified jurors from Mineral County were available, the trial court in the *Cosner* case caused a venire of forty eight jurors from Tucker County to be summoned for the trial of the case and, under the foregoing facts, this Court issued a writ which prohibited the judge of the trial court from obtaining a jury from Tucker County for the trial of the defendant in Mineral County.

In the case at bar, as indicated by the facts recited in the majority opinion and as disclosed by the plea in abatement of the defendant, by the verified answer to the plea, which was filed and considered as an affidavit of the prosecuting attorney of Clay County, by the report of the grand jury which attended the February Term, 1953, of the Circuit Court of Clay County, which was also filed, and by the stipulation filed by the parties, all of which are a part of the record in this case, a completely different situation existed in Clay County at the time of the trial of the defendant at the special term of the circuit court which began on July 27, 1953, and at which the defendant

was convicted and sentenced, from the situation which existed in Mineral County at the time the jury was summoned from another county for the trial of the defendant in the *Cosner* case.

The record in the case at bar shows that at the special term of the circuit court at which the defendant was tried in July, 1953, the population of Clay County was 14,961; that the voting population of that county was 7,228; that there were 3,767 men eligible for jury service in that county; that 110 jurors were summoned for the Regular June Term, 1953, of the circuit court; that the regular jury commissioners of that court in August, 1952, caused a list of 200 names of eligible jurors, and in June, 1953, an additional list of 100 eligible jurors, to be placed in the jury box; that at the time the jurors from Braxton County were summoned there remained in the jury box the names of fifty inhabitants of Clay County eligible for jury service; that no effort was made to determine whether those persons could qualify as jurors for the trial of the defendant or to obtain other inhabitants of Clay County for service as jurors in the trial of the case; that the offense with which the defendant was charged grew out of a strike; that the striking employees formed and maintained picket lines at certain points; that hostile feelings existed between the strikers and other employees; that a large number of strikers assembled where picket lines were formed especially at Widen Hill; that a great number of offenses were committed by one or the other of these groups; that the result of such activities created a "quasi state of feud"; that much publicity was given to existing conditions; that the general feeling throughout the county was a feeling of hostility or of sympathy toward the cause of the strikers; that at the June Term, 1953, of the Circuit Court of Clay County, Virgil Nelson and other persons were indicted by a grand jury for offenses arising from the strike; that difficulty was experienced in obtaining a panel of twenty qualified jurors from the venire called for the June Term; that after a panel of twenty jurors was obtained to try Nelson it was the general feeling of experienced counsel representing

the State that the members of the jury were divided in their emotions and opinions concerning the issue to be tried; that a "hung jury" resulted in the Nelson trial; that later the court attempted to empanel a jury for the trial of Jack Lanham for an offense growing out of the strike; and that the entire venire attending the court was exhausted without obtaining a panel of twenty qualified jurors.

The foregoing facts are not disputed and the defendant, though given the opportunity to do so, offered no proof to controvert the statements in the answer which was treated as an affidavit of the prosecuting attorney. These facts indicate clearly that in July, 1953, a qualified jury could not have been obtained in Clay County for the trial of the defendant and that the action of the circuit court in summoning jurors from Braxton County was entirely proper and was fully authorized by the provisions of Section 20, Article 1, Chapter 52, Code, 1931. It is difficult to see how any action which might have been taken by the trial court could have resulted in the selection of a qualified jury from persons residing in that county who were eligible to serve as jurors in the case.

The vital difference between the *Cosner* case and this case on that point is that in the *Cosner* case it clearly appeared from the record that a qualified jury from Mineral County could readily have been obtained for the trial of the defendant and that in this case it clearly appears from the record that a qualified jury from Clay County could not have been obtained for the trial of the defendant.

The holding of the majority in this case, which denies the authority of the Circuit Court of Clay County, in the recited facts and circumstances existing in that county at the time of the trial, will inevitably result in protracted, or indeed interminable, delay in the selection of a qualified jury in that county. Until a qualified jury in Clay County is selected, or such a jury can not be obtained, which must clearly appear before a jury may be summoned from another county, the defendant can not be tried for the grievous offense for which he has been in-

dicted. The defendant is entitled to a speedy trial and it is the duty of the State to prosecute the case to its conclusion without undue delay. Justice delayed is justice denied. The unwarranted holding of the majority that it does not clearly appear that a qualified jury can not be obtained from persons eligible for jury service in Clay County, which is contrary to the undisputed facts established by the record and recited in the majority opinion, renders the trial of the defendant by a qualified and impartial jury composed of persons residing in Clay County eligible for such service a present practical impossibility. Such a situation is wholly unnecessary and utterly intolerable and with the decision which creates it I can not agree.

The majority opinion furnishes no practical guide to the circuit court in selecting a qualified jury in Clay County for the trial of the defendant. It does not state definitely whether the circuit court, in an effort to select a qualified jury, by summoning successive venires, is required to determine the qualifications of all or a substantial number of the prospective jurors included in the lists already prepared by the jury commissioners, only fifty of which had apparently not been examined at the time the Lanham case was called for trial, or whether, if that endeavor fails to obtain a qualified jury, the circuit court is required to determine the qualifications of a substantial number of the hundreds of residents of Clay County who are or may be eligible to serve as jurors for the trial of the defendant, before the court may summon a jury from another county. Either of the foregoing efforts would manifestly consume much time and would be utterly futile. Though the majority indicates that it is not necessary that a trial court order the drawing of every available juror or of any percentage of available jurors of a county before directing the empanelling of a jury from another county, it declines to formulate any definite rule for the guidance of the circuit court in the presently existing difficult situation in Clay County. The majority does, however, intimate, by quoting from the Kentucky case of *Fannon* v. *Commonwealth*, 295 Ky. 817,

175 S. W. 2d 531, that the trial court should make some attempt or test, by the examination of prospective jurors, before summoning jurors from another county but the nature and the extent of the effort required are not indicated. As previously mentioned, the circuit court did exhaust one venire of local jurors in an unsuccessful effort to obtain a jury for the trial of Jack Lanham who was indicted for an offense growing out of the strike, but a similar effort in connection with the trial of the defendant would doubtless be deemed insufficient by the majority of this Court.

Whether the circuit court is required to examine fifty jurors, one hundred jurors, three hundred jurors, or an indefinite additional number of the 3,767 persons in Clay County who are eligible for jury service, in an unsuccessful effort to obtain a qualified jury from that county for the trial of the defendant before summoning jurors from another county for that purpose is left to sheer speculation. Though the majority concedes that the determination of the question of the propriety of causing jurors to be summoned from another county is within the discretion of the trial court, its present holding is that the circuit court abused its discretion in summoning a jury from Braxton County; and the effect of that holding is that the circuit court is placed in an unnecessary and intolerable position of doubt and uncertainty.

If the circuit court, before summoning a jury from another county for the trial of the defendant, must examine all of the prospective jurors on the lists already prepared by the jury commissioners and, in addition, a large number of several hundred other residents of Clay County who are eligible to serve as jurors, in an effort to obtain a qualified jury from that county, it is most unlikely that the defendant will ever be tried before a qualified and impartial jury selected from that county for the offense for which he has been indicted and of which he was convicted by competent evidence which established his guilt beyond all reasonable doubt and which the majority concedes sufficiently supports the verdict of guilty returned by the jury.

As to the second alleged error it is difficult to comprehend how the phrase "where a homicide is proven by the use of a deadly weapon, such as the case now before you," contained in Instruction No. 6 given by the trial court at the instance of the State could have prejudiced the defendant. That some person shot and killed Frame and in consequence that a homicide was committed is a clearly established fact and the quoted phrase in the instruction merely recites or refers to a conceded actuality. By no stretch of the imagination can it be contended or assumed that the quoted words complained of expressly or by implication imparted any suggestion to the jury that the defendant committed the homicide. Whether he did or did not fire the shot which caused the death of Frame was one of the controlling controverted issues in the case with respect to which much evidence was introduced by the State to show that he did fire the fatal shot and much evidence was introduced in behalf of the defendant to show that the bullet which killed Frame did not come from the rifle used by him but instead came from a weapon used by some other unknown person. The words, "such as the case now before you," merely referred to the admitted fact that Frame was killed by a shot which came from a deadly weapon and do not in any way indicate to the jury that it came from the rifle used by the defendant and could not possibly have misled or confused the jury on the disputed question of the identity of the person who fired the fatal shot. The quoted phrase in the instruction, as well as the other statements in the instruction, are based upon the evidence, the instruction in its entirety correctly propounded the law, and the action of the trial court in giving it was in all respects correct and proper. The statement complained of in the instruction bears no actual resemblance to the statement in an instruction given in *State* v. *Aliff*, 122 W. Va. 16, 7 S. E. 2d 27, cited in the majority opinion, "where the State has established a prima facia case.", which this Court condemned as erroneous in that case. The quoted statement in the instruction in the *Aliff* case clearly indicated to the jury that

the State had established a prima facia case of guilt against the defendant, and of course that statement in the instruction was error. As already pointed out, however, the quoted portion of the instruction complained of in this case does not suggest that the defendant committed the homicide but merely recites the conceded fact that a homicide had been committed without any indication that it was committed by the defendant. A reversal of the judgment on the ground that the quoted statement in the instruction misled the jury is, in my judgment, wholly unjustified.

Instruction No. 13, offered by the State, the giving of which by the trial court constitutes the basis of the third alleged error, is quoted in full in the majority opinion and, as reference to the instruction shows, it merely defines "peaceful picketing" and is based upon the evidence. Though the instruction is somewhat abstract in form it correctly defines peaceful picketing. In my judgment it does not relate to or adversely affect the defendant's theory of self-defense which was fully covered, as the majority concedes, by other instructions in the case. The majority also concedes that the instruction was not intended to affect that theory of the defense. Though the instruction could well have been omitted, the action of the trial court in giving it, in my judgment, did not constitute prejudicial error. To reverse the judgment on that ground is, in my opinion, highly technical and utterly unwarranted.

It is clear to me that the defendant had a fair trial which was free from any prejudicial error. The evidence shows beyond all reasonable doubt that the defendant is guilty of the offense of which he was convicted by the verdict of the jury. For these reasons I would affirm the judgment of the circuit court.

I am authorized to state that Judge Browning concurs in the views expressed in this dissent.